STANDARD ACCIDENT INSURANCE COMPANY, PLAINTIFF-APPELLANT, v. PELLEGRINO JAMES PELLECCHIA, JR., DEFENDANT, AND FEDERAL TRUST COMPANY, DEFENDANT-RESPONDENT.

Argued February 15 and 23, 1954—Decided April 5, 1954.

164

*Mr. Louis Auerbacher, Jr.,* argued the cause for the appellant.

*Mr. Charles S. Barrett, Jr.,* argued the cause for the respondent (*Messrs. Lum, Fairlie & Foster,* attorneys).

The opinion of the court was delivered by

VANDERBILT, C. J. The plaintiff Standard Accident Insurance Company appeals from a summary judgment entered in the Law Division of the Superior Court in favor of the Federal Trust Company, one of the defendants.

## I.

On January 10, 1946 Standard issued to the Columbus Trust Company two fidelity bonds totalling $175,000 to protect that institution, among other things, against loss arising out of any fraudulent, dishonest or criminal acts of its officers and employees, and effective March 1, 1948 this coverage was increased to $200,000. While these bonds were in effect P. James Pellecchia, Jr., also a defendant in this action, was vice-president and counsel of Columbus, the stock of which was largely controlled by his family. Between January 1946 and July 1948 Pellecchia looted Columbus of about $657,000 through his fraudulent handling of mortgage loan transactions as counsel of Columbus. On 20 different occasions during this period Pellecchia caused funds to be loaned by Columbus on notes purporting to be secured by real estate mortgages and then converted these monies to his own use.

Although all his defalcations involved mortgage loans by Columbus, Pellecchia adopted various techniques in carrying out his fraudulent activities. In 14 instances he prepared mortgage applications in the names of fictitious persons seeking loans on real property in or near Newark that was being advertised for public sale. After each application had been approved by the board of directors, it would be turned over to Pellecchia as the bank's attorney to make the necessary examination of title. In due course he would report to the

bank that the title was clear and the bank would then issue its treasurer's check in the full amount of the loan to the order of the fictitious mortgagors and deliver it to *Pellecchia* to consummate the mortgage transaction. He would thereupon endorse the check to his own order by signing the name of the fictitious payees and would give the bank fraudulent mortgage papers. In another instance the purported mortgagors were actual persons who held title to the property involved, but they had not submitted the mortgage application in question and had no knowledge of it. They, of course, received no part of the proceeds of the check of the bank to their order, for Pellecchia signed their names in endorsing the check and converted it to his own use. On two other occasions the mortgage applications were *bona fide*, but prior mortgages on the property were to be paid off by Pellecchia out of the checks of the bank, but instead he converted these monies to his own use and let these preexisting mortgages remain as prior liens on the properties on which the bank thought it was procuring first liens. In each of three remaining transactions Pellecchia used the name of one or another of the corporations he had formed on the mortgage applications and listed property therein which was not owned by the applicants. After depositing the proceeds of each of these mortgages to the account of the payee corporation, he soon withdrew the funds and appropriated them to his own use.

Of the 20 checks issued by Columbus in these fraudulent mortgage transactions only 18, totalling $587,000, were deposited by Pellecchia in the Federal Trust Company, 16 to his personal account and two to the accounts of the dummy corporations formed by him, the other two checks of Columbus clearing through other banks. In this action, however, only 15 of the checks of Columbus, representing some $516,500, are involved. After stamping the checks "prior endorsements guaranteed, Federal Trust Company," Federal forwarded them for collection to Columbus and credited the proceeds of 14 of them to Pellecchia's personal account in Federal while the fifteenth was credited to the account of a dummy corporation. Pellecchia drew the funds out of his personal

account and the corporate account in Federal for his own purposes, largely for the payment of gambling debts.

Pellecchia's personal account in Federal was opened on December 29, 1941 with a deposit of $1,900. From that date until January 23, 1946, a four-year period, Pellecchia drew 59 checks on this account, or an average of slightly more than one a month, while he made 29 deposits, or an average of approximately three deposits every five months. On the other hand, during the 2½-year period of his defalcations from January 23, 1946 until July 13, 1948, Pellecchia drew approximately 700 checks on the account, or an average of about 24 a month, while at the same time he made about 350 deposits to the account, or approximately 11 a month. While withdrawals and deposits during the earlier four-year period totalled about $74,000, those in the later 2½-year period amounted to approximately $1,600,000, including the sum of $587,000 fraudulently obtained by him from Columbus. Of the 15 checks here involved, 14 ran into five figures, ranging in amount from $24,000 to $50,000. One check in the amount of $45,000 deposited to this account was endorsed to the order of "P. James Pellecchia, Jr., attorney" while another in the amount of $35,000 was drawn to the order of "P. James Pellecchia, Jr., attorney." Both were deposited to his personal account. All the rest of the 15 checks in question were drawn to the order of the mortgagors and endorsed by Pellecchia personally and, except for the one check payable to the corporate mortgagor, were deposited in his personal account with Federal.

When Pellecchia's fraudulent activities became known in July 1948, Columbus collapsed, and on July 12, 1948 its assets were taken over by the Federal Deposit Insurance Corporation. Meanwhile Pellecchia pleaded guilty to criminal charges and was sentenced to prison, where he still remains. The Federal Deposit Insurance Corporation called on Standard to pay under its fidelity bonds to Columbus, which it did to the full extent of its liability of $200,000. While still in the possession of the assets of Columbus, the Federal Deposit Insurance Corporation in July and August

1949 made claim in writing against Federal for $516,500, based upon its guaranty of the forged or fraudulent endorsements on the 15 checks of the treasurer of Columbus deposited by Pellecchia in Federal. No suit was instituted to enforce this claim. Federal maintained that it had valid defenses to the claim, contending among other things that the loss was occasioned not by any negligence on its part but rather by the laxity of the officials of Columbus in permitting these fraudulent mortgage transactions by Pellecchia. Federal also claimed that many of the checks were drawn to the order of fictitious persons, giving rise to the contention that they should be construed as bearer checks drawn with knowledge imputable to Columbus through Pellecchia, its vice-president and counsel, and that in some instances the payee was nonexistent and hence that there was no forgery by Pellecchia and therefore no liability on the part of Federal on its guaranty of endorsements.

Meanwhile the liquidating agents of Columbus were considering the purchase from the Federal Deposit Insurance Corporation of the assets of that bank, including any claim which Columbus might have against Federal on account of the guaranty of the endorsements on its checks. Before consummating any such transaction the liquidating agents negotiated with Federal to see if Federal would pay all or any part of the claim of Columbus on the guaranty of endorsements by Federal. On learning of these negotiations Standard notified Federal and the liquidating agents of Columbus of its claim to be subrogated to the rights of Columbus against Federal by reason of its payment to Columbus under the fidelity bonds and that it would not be bound by any settlement on account of this claim made without Standard's consent. The Commercial Casualty Insurance Company, which had insured Federal against loss by the negligence of its officers and employees, entered into the negotiations for a possible settlement of the claim of Columbus against Federal. Ultimately it was agreed that Federal would pay Columbus $175,000 (one-half of which was to be paid by Commercial Casualty and one-half by Federal) in full settle-

ment of the claim of Columbus against it on account of its guaranty of the check endorsements. The liquidators, aware of Standard's claim of subrogation, were reluctant to enter into any such settlement with Federal in the absence of some protection against the eventuality that Standard would attempt to hold them liable for settling a claim possibly worth $516,500 for a lesser figure, thus defeating Standard's subrogation rights. Federal therefore agreed to guaranty Columbus and its stockholders against any such claims asserted by Standard, and this guaranty was made a part of the agreement whereby Federal was to pay Columbus $175,000 in settlement of its claims on Federal's guaranty of the check endorsements.

On September 25, 1950 Columbus bought back its assets, including the claim against Federal, for $170,994.89, the full balance then due to the Federal Deposit Insurance Corporation, and on the same day consummated the proposed settlement with Federal and its surety, Commercial Casualty Insurance Company, for $175,000.

Standard refused to be bound by this settlement agreement between Federal and Columbus and made demand on Federal for $516,500 on account of the guaranty of check endorsements, which Federal declined to pay. Standard thereupon instituted this action against Federal and Pellecchia in the Law Division of the Superior Court but the action against Pellecchia is not involved here. Insofar as this appeal is concerned, Standard's complaint against Federal is based on its payment of $200,000 to Columbus in satisfaction of its liability to Columbus on its two fidelity bonds, as a result of which it became subrogated to the extent of $200,000 to the rights that Columbus had against Federal by reason of the latter's contractual guaranty of endorsements on the false or forged checks, Standard claiming that the settlement by Federal and Columbus of this claim for $175,000 after notice from Standard was without effect as to Standard.

After discovery proceedings had been completed, Federal moved for summary judgment. At the hearing of this motion it became apparent that further discovery was neces-

sary. The trial court thereupon adjourned the hearing on the motion until the discovery proceedings could be completed. Thereafter Federal's renewed motion for summary judgment was granted, the trial court holding that although Federal by guarantying the endorsements of the checks issued by Columbus had incurred a contractual liability to it, still Federal was innocent in equity and Standard could not recover because its "right of subrogation * * * is conditional and the condition, namely, a superior equity to that of Federal, is nowhere demonstrated in the pleadings, proof or inferences therefrom." The defendant appealed to the Appellate Division of the Superior Court and we certified the appeal on our own motion while it was pending there.

## II.

Subrogation is a device of equity to compel the ultimate discharge of an obligation by the one who in good conscience ought to pay it, *Camden Trust Co. v. Cramer*, 136 *N. J. Eq.* 261, 264 (*E. & A.* 1944), *Restatement of the Law of Security*, § 141, *comment (a)*. It is a right of ancient origin, having been imported from the civil law to serve the interests of essential justice between the parties, *Sullivan v. Naiman*, 130 *N. J. L.* 278, 280 (*Sup. Ct.* 1943). It is most often brought into play when an insurer who has indemnified an insured for damage or loss is subrogated to any rights that the insured may have against a third party, who is also liable for the damage or loss. In such a case it is only equitable and just that the insurer should be reimbursed for his payment to the insured, because otherwise either the insured would be unjustly enriched by virtue of a recovery from both the insurer and the third party, or in the absence of such double recovery by the insured the third party would go free despite the fact that he has the legal obligation in connection with the loss or damage.

Subrogation is highly favored in the law, *Schmid v. First Camden National Bank*, 130 *N. J. Eq.* 254, 266 (*Ch.* 1941), although it is not an absolute right but rather is

applied under equitable standards with due regard to the legal and equitable rights of others, *Gaskill v. Wales*, 36 *N. J. Eq.* 527, 533 (*E. & A.* 1883):

"The right of subrogation must be founded upon an equity just and reasonable according to general principles—an equity that will accomplish complete justice between the parties to the controversy. The one asserting the right cannot thereby profit from his own wrong; he must, himself, be without fault. *Bater v. Cleaver*, 114 *N. J. L.* 346. * * * The process is analogous to the creation of a constructive trust, the creditor being compelled to hold his rights against the principal debtor, and his securities, in trust for the subrogee." *Camden Trust Co. v. Cramer, supra,* 136 *N. J. Eq.* 261, at 264.

See *Ganger v. Moffett*, 8 *N. J.* 73, 79 (1951). Although subrogation is of equitable origin and is enforced on equitable principles, recovery is generally sought at law.

"While it is a doctrine of purely equitable origin and nature, it is now settled that, when the right or subrogation itself is practically conceded, and there remains to be enforced only the right of realizing the value of the subject-matter, such right may, on proper occasion, be within the cognizance of a court of law. * * * But the right of subrogation will not be recognized at law unless the right of action made the subject thereof is legal in its nature, and is cognizable at law." *Bater v. Cleaver*, 114 *N. J. L.* 346, at 353 (*E. & A.* 1935)

The right does not arise out of contract but rather exists without the consent of the insured, *Fire Association of Philadelphia v. Schellenger*, 84 *N. J. Eq.* 464, 465 (*E. & A.* 1915), although of course the parties may by agreement waive or limit the right, *Ganger v. Moffett, supra,* 8 *N. J.* 73, 80, *Fire Association of Philadelphia v. Schellenger, supra,* 84 *N. J. Eq.* 464, 466. The subrogee in effect steps into the shoes of the insured and can recover only if the insured likewise could have recovered, *Sullivan v. Naiman, supra,* 130 *N. J. L.* 278, 280, *Connecticut Savings Bank of New Haven v. First National Bank & Trust Co. of New Haven,* 138 *Conn.* 298, 84 *A. 2d* 267, 270 (*Sup. Ct. Err.* 1951). He is subject to all legal and equitable defenses that the third party may have either against him or against the insured and there

can be recovery only if the cause is just and enforcement is consonant with right and justice, *Bater v. Cleaver, supra,* 114 *N. J. L.* 346, 354.

The claim to which Standard contends that it is subrogated is the right of action vested in Columbus as against Federal on the latter's guaranty of the prior endorsements, which admittedly were forged by Pellecchia. Standard in effect says to Federal: "By virtue of our payment of $200,000 to Columbus we became subrogated to any claims that Columbus may have against you arising out of Pellecchia's defalcations. When you guaranteed prior endorsements on the checks that contained forged endorsements, you became contractually liable in the amount of these checks to Columbus, the drawer and drawee bank. We are subrogated to this claim of Columbus and we now have a valid claim against you, at least in the amount of $200,000." Federal does not dispute the plain logic of this legal reasoning, apparently admitting that all things being equal it would have been liable to Columbus under its guaranty of prior endorsements on these checks. On this point see *First National Bank of Bloomingdale v. North Jersey Trust Company,* 18 *N. J. Misc.* 449, 451 (*Sup. Ct.* 1940); *Tarrant American Savings Bank v. Smokeless Fuel Co.,* 233 *Ala.* 507, 172 *So.* 603 (*Sup. Ct.* 1937), 2 *Paton's Digest* (1942) 2120 with citations therein. It does, however, set up various affirmative defenses in its answer which it claims bar any recovery by Standard. It contends that its settlement with Columbus of the very claim asserted by Standard is valid and prevents any recovery here by Standard, which necessarily has no greater rights than Columbus had. It also claims that Columbus was contributorily negligent in failing to discover and stop Pellecchia's fraudulent activities, which it says bars Standard from recovery here. It also asserts that the payees of the checks were persons who were known to be fictitious by Pellecchia, and that his knowledge was imputed to Columbus with the result that these were bearer checks and Federal incurred no liability because of its endorsement. Federal further maintains that Standard cannot recover because it has no

"superior equity" to that of Federal which it alleges was guilty of no negligence or wrongdoing in the acceptance of these checks for deposit.

On its motion for a directed verdict Federal claims, as hereinbefore stated, that its settlement with Columbus was binding and precludes any right of recovery by Standard. Federal maintained that Standard's rights of subrogation depend upon the salvage clause of its surety contract with Columbus, and that in the absence of a provision requiring Standard's consent to a settlement of the claim against Federal that Columbus had an absolute right to make the agreement with Federal, which therefore is binding on Standard. It is true that the salvage clause does not expressly provide that Standard must consent to any settlement made with Federal, but our courts have not hesitated to set aside settlements when made in fraud of the surety, even in the absence of such a provision in the surety policy. Thus, in *Fire Association of Philadelphia v. Wells*, 84 *N. J. Eq.* 484 (*E. & A.* 1915), the defendant's buildings, which were insured by the plaintiff company in the amount of $2,000, were destroyed by fire due to the negligence of the employees of the Atlantic City Railroad Company. After the fire the plaintiff paid the defendant the $2,000 and received an assignment from him of any rights he might have against any person responsible for the loss. Subsequently the defendant, whose total loss was some $7,000, compromised his claim against the railroad company for $5,000 and gave a release. The plaintiff brought action against the defendant for a refund of the $2,000 paid him upon the ground that as a result of this release he was estopped from proceeding as subrogee against the railroad company. The court held that the legal effect of the release was to bar the plaintiff's action against the railroad company and decreed that the defendant must refund the $2,000. The Court of Errors and Appeals reversed, saying:

"We are of opinion that this result is not equitable, for the release was not, under the facts, a bar which estopped the complainant from asserting its right as subrogee. Both defendant and the rail-

road company knew, or are chargeable with knowledge, that the complainant had upon payment become entitled by subrogation to call upon the railroad company to reimburse it the money it paid the owner on its policy of insurance, and they could not defeat that right by any árrangement they might make without complainant's consent. If the loss for which the railroad company was liable amounted to $7,000, it has not liquidated its responsibility by paying $5,000, and until it has discharged its liability, the rights of a subrogee cannot be destroyed by obtaining a release upon paying to the insured what he deemed to be the residue of his loss; for a release of that nature is such a fraud upon the subrogee as will avoid it both at law and in equity so far as it affects the rights of the subrogee." (at 486)

See *Monmouth County Mutual Fire Insurance Co. v. Hutchinson*, 21 *N. J. Eq.* 107 (*Ch.* 1870); *Martin v. Lehigh Valley Railroad Co.*, 90 *N. J. L.* 258 (*E. & A.* 1917); *Camden Fire Insurance Association v. Prezioso*, 93 *N. J. Eq.* 318 (*Ch.* 1922); *King, Subrogation Under Contracts Insuring Property*, 30 *Tex. L. Rev.* 62, 87 (1951).

 Federal was aware of Standard's interest and of its desire to be consulted in this matter, yet it and the liquidating agents of Columbus deliberately entered into a settlement for $175,000 of a claim possibly worth three times that amount without consulting Standard and without regard to its rights. The trial court's ruling that as a matter of law the settlement of Federal with Columbus and the subsequent release of Federal by Columbus do not constitute a bar to the action by Standard is sound.

 The main question before us is the propriety of granting the summary judgment. Summary judgment is necessarily based on a finding that there is palpably no genuine issue as to any material facts and that the defendant as the moving party is entitled to judgment as a matter of law, *R. R.* 4:58–3. Since subrogation is based on equity, though generally enforced at law, it does not exist here if Columbus or Standard has been guilty of unconscionable conduct. Federal has set up in its answer that Columbus was "contributorily negligent" in that the unconscionable conduct of Pellecchia, its vice-president and counsel, is imputable to Columbus, that Columbus entrusted to Pellecchia the

handling of the details of these transactions that gave rise to the drawing of the checks and failed to properly investigate his activities and to examine return vouchers and bank statements, and generally failed to take reasonable precautions or to set up reasonable and proper procedures to guard against loss. The pleadings, depositions and affidavits that must be considered in support of the motion for summary judgment reveal that a factual question exists as to whether Columbus was guilty of such inequitable conduct as to bar recovery by Standard, its subrogee, against Federal. The issue thus raised is equitable and it is to be tried as equitable issues regularly are by the court without a jury. The issue is not one, as raised in the answer and in the motion for summary judgment, of negligence or contributory negligence, for Standard's cause of action against Federal is not based in tort, where issues of negligence and contributory negligence regularly arise, but rather on Federal's contractual obligation to Columbus which has nothing to do with torts. If Federal proves its charge of unconscionable conduct against Columbus, Standard cannot recover. The burden of proof, of course, is on Federal to establish its alleged equity of unconscionable conduct by Columbus. This phase of the case will doubtless turn on such evidence as Federal may produce as to the conduct of Columbus in the light of the normal course of the conduct of banking business.

Because Federal's equitable claim of unconscionable conduct on the part of Columbus raises issues of fact that the trial court must consider, the summary judgment is reversed and the case remanded for trial.

 Another defense urged by Federal requires consideration in advance of trial. It is that section 4 of the Uniform Fiduciary Act (*N. J. S.* 3*A*:41–4) is applicable and absolves it of any liability:

"If any negotiable instrument payable or indorsed to a fiduciary, as such, is indorsed by the fiduciary, or if any negotiable instrument payable or indorsed to his principal is indorsed by a fiduciary empowered to indorse such instrument on behalf of his principal, the indorsee is not bound to inquire whether the fiduciary is committing

a breach of his obligation as fiduciary in indorsing or delivering the instrument, and is not chargeable with notice that the fiduciary is committing a breach of his obligation as fiduciary unless he takes the instrument with actual knowledge of such breach or with knowledge of such facts that his action in taking the instrument amounts to bad faith."

Here, however, only two of the checks were "payable or indorsed to a fiduciary, as such." The rest were payable to the mortgagors and indorsed to Pellecchia personally and not as attorney, and the quoted statute obviously does not apply to him. As to the two checks "payable or indorsed to a fiduciary, as such," Federal argues that section 9 of the Uniform Fiduciary's Law:

"If a fiduciary makes a deposit in a bank to his personal credit of checks drawn by him upon an account in his own name as fiduciary, or of checks payable to him as fiduciary, or of checks drawn by him upon an account in the name of his principal, if he is empowered to draw thereon, or of checks payable to his principal and indorsed by him, if he is empowered to indorse such checks, or if he otherwise makes a deposit of funds held by him as fiduciary, the bank receiving such deposit is not bound to inquire whether the fiduciary is committing thereby a breach of his obligation as fiduciary; and the bank is authorized to pay the amount of the deposit or any part thereof upon the personal check of the fiduciary without being liable to the principal, unless the bank receives the deposit or pays the check with actual knowledge that the fiduciary is committing a breach of his obligation as fiduciary in making such deposit or in drawing such check, or with knowledge of such facts that its action in receiving the deposit or paying the check amounts to bad faith." *N. J. S.* 3*A*:41–9.

relieves it of liability from its guaranty of the forged endorsements, but there is nothing in that section that in any way relieves a bank from its guaranty of prior endorsements.

### III.

There are no cases in New Jersey dealing with the subrogation of a surety (Standard) against a bank (Federal) on its contract guaranteeing the endorsements on checks to another bank (Columbus), and the decisions in other jurisdictions vary widely in their results and in their reasoning.

There are, however, a considerable number of decisions in this State and elsewhere dealing with subrogation as applied to various factual situations under insurance policies that shed light on the proper solution of our problem.

The trial judge concluded that in order for Standard to prevail it must show an equity superior to that of Federal and that if the equities are equal it could not recover.

This doctrine that recovery is permitted only if the subrogee shows a "superior equity" is asserted in the many cases of subrogation, where the subrogation is based on the defendant's tort. For example, in a case where property is destroyed by the negligence of a third party and the insurer pays the insured the amount of his damage, the insurer-subrogee in seeking to recover against the third party must necessarily prove that it was the third party's negligence that caused the damage, and at the same time he cannot prevail if the third party shows that the damage resulted from the insured's contributory negligence. In short, in these tort actions the insurer-subrogee steps into the shoes of his insured and is bound by the principles of the law of negligence which would control if the insured himself were bringing suit. To say that the subrogee in tort actions recovers only if he proves a superior equity is merely to complicate a simple situation at law by improperly applying to it the language of equity.

In subrogation suits, based not on the torts of a third party but on his contractual obligation to the insured, there was some reluctance in the early decisions to permit any recovery. It is difficult to understand why any court that would permit subrogation against a tortfeasor should hesitate to allow subrogation based on a contractual obligation of the defendant, for the assignment of tort claims was frowned upon at law while the assignment of choses in action and of many kinds of contracts was encouraged. It is now well settled generally that such an action in subrogation on the contractual obligation of the defendant to an insured exists in favor of the insurer. Thus, in *Federal Insurance Co. v. Englehorn*, 141 *N. J. Eq.* 349, 351 (1948), our Court of Errors and Appeals in affirming the judgment below adopted

the opinion of the lower court, which stated that "there is also authority for the proposition that the insurer's right to subrogation is not limited to claims based on tort but extends to a cause of action by the insured against a third party founded on contract, 46 *C. J. S., Insurance* 154, § 1209." In *F. H. Vahlsing, Inc. v. Hartford Fire Insurance Co.,* 108 *S. W. 2d* 947 (*Tex. Ct. Civ. App.* 1937) the insurance company had issued a policy to a railroad covering loss by fire, and thereafter paid the full amount of its liability when some fifteen railroad cars were damaged by fire. The insurance policy provided that upon payment of any loss by the insurance company the railroad would assign any rights arising out of the loss it might have against a third party. Vahlsing, Inc. had leased certain sheds and buildings from the railroad company and under the terms of the lease agreement had agreed to be responsible for cars on these leased premises, including the cars in question. The insurance company brought suit against Vahlsing based on this provision in the lease. It recovered judgment in the trial court and on appeal the court affirmed, saying that "if the railroad company would be entitled to recover for the loss as against the appellant, the insurance company in this action stands in its shoes and would also be entitled to recover." (108 *S. W. 2d, at page* 950) In *Chicago, St. Louis & New Orleans Railroad Co. v. Pullman Southern Car Co.,* 139 *U. S.* 79, 11 *S. Ct.* 490, 35 *L. Ed.* 97 (1891), two of Pullman Company's sleeping cars were destroyed by fire while on the railroad company's premises. The cars were leased to the railroad under an agreement with Pullman whereby the railroad was to be responsible for any loss or damage to the cars. After the cars were destroyed by fire, Pullman's insurance company paid the amount of the loss and then brought this action against the railroad in Pullman's name. The court held that such an action based on the contract could be brought by the insurance company as subrogee:

"Upon payment of the loss, or to the extent of any payment by them on account of such loss, the insurance companies were subrogated to the rights of the insured, and could, in the name of the

insured, or in their joint names, maintain an action against the railroad company for indemnity, if that company was liable to the insured for the loss of the cars. The acceptance of a given amount from the insurance companies in full discharge of their liability did not affect the right of the plaintiff to recover from the railroad company the whole amount of the loss for which the latter was responsible under its contract. The plaintiff could recover only one satisfaction for the loss; and if the amount recovered from the railroad company, increased by the sum collected from the insurance companies, was more than sufficient for its just indemnity, the excess would be held by it in trust for the insurance companies. The inquiry in this action is as to the amount for which the railroad company is bound on its contract with the plaintiff, and the recovery is not affected or limited by the amount collected from the insurance companies." (139 *U. S.* 79, at *page* 87, 11 *S. Ct.* 490, at *page* 493, 35 *L. Ed.* 97, at *page* 100)

See *Continental Insurance Co. v. I. Bahcall, Inc.*, 39 *F. Supp.* 315, 319 (*D. C. Wis.* 1941), where the court stated:

"Under Wisconsin law, when an insurer pays to the insured the amount of the loss, it is subrogated in a corresponding amount to the insured's right of action against any other person responsible for the loss. The insurer is entitled to all of the remedies and securities of the assured and to stand in his place. *Swarthout v. Chicago & North Western Railway Co.*, 49 *Wis.* 625, 629, 6 *N. W.* 314. The right of subrogation is not limited to cases where the liability of the third person is founded in tort; but any right of the insured to indemnity will pass to the insurer on the payment of loss. 26 *C. J., p.* 458."

See also *Interstate Ice & Power Corp. v. U. S. Fire Insurance Co.*, 243 *N. Y.* 95, 152 *N. E.* 476 (*Ct. App.* 1926); *Nobbe v. Equity Fire Insurance Co.*, 210 *Minn.* 93, 297 *N. W.* 349 (*Sup. Ct.* 1941); *Hartford Fire Insurance Co. v. Payne,* 199 *Iowa* 1008, 1009, 203 *N. W.* 4, 39 *A. L. R.* 1109 (*Sup. Ct.* 1925); *Hall & Long v. Nashville & Chattanooga Railroad,* 13 *Wall.* 367, 20 *L. Ed.* 594 (*U. S.* 1871); *King, supra,* 30 *Tex. L. Rev.* 62, 71, *note,* 28 *Col. L. Rev.* 202 (1928); *Langmaid, Subrogation in Suretyship and Insurance,* 47 *Harv. L. Rev.* 976 (1934); 6 *Appleman, Insurance Law and Practice* (1942) 521; *Campbell, Non-Consensual Suretyship,* 45 *Yale L. J.* 69 (1935).

Insurers have been permitted to recover in a wide variety of situations where the defendant is liable on contract to the

insured. For example, there is the case where the mortgagee insures property to protect his interest therein and the property is later destroyed by fire. There the rule in New Jersey as well as in a majority of jurisdictions is that the insurer upon reimbursing the insured mortgagee is entitled to be subrogated to the extent of the amount paid to the mortgagee's right to enforce payment of the mortgagor's debt, *Leyden v. Lawrence*, 79 *N. J. Eq.* 113 (*Ch.* 1911), affirmed 80 *N. J. Eq.* 550 (*E. & A.* 1912). See *Le Doux v. Dettmering*, 316 *Ill. App.* 98, 43 *N. E.* 2d 862, 867 (*App. Ct.* 1942); *City of N. Y. Insurance Co. v. Abraham*, 20 *So.* 2d 183, 185 (*La. App.* 1944); *Rarrick, Right of Insurer to be Subrogated to the Rights of Mortgagee*, 31 *Ill. B. J.* (1943). Richards says that in most instances the courts have also treated a conditional sales contract as the equivalent of a mortgage and applied the same rules of subrogation in describing the rights of an insurer who has paid the loss to the vendor (or mortgagee) as subrogee against the purchaser (or mortgagor), 2 *Richards on Insurance* 670 (1952).

Another familiar situation is that where the insurer claims the right of subrogation to its insured's claim against the common carrier, based upon the latter's contractual obligation to deliver the goods in good condition. Generally in the United States the insurer has been allowed subrogation, *Hartford Fire Ins. Co. v. Payne, supra*, 189 *Iowa* 1008, 1010, 203 *N. W.* 4, 5; *Campbell, supra*, 45 *Yale L. J.* 69, 79, although the situation has been confused by the injection of clauses in the carrier's contract with the shipper giving it the benefit of any insurance effected on the shipment; see *note*, 37 *Harv. L. Rev.* 901 (1924).

In respect to bailments in situations where the bailee has broken his contract and the insurer pays the insured bailor the amount of the loss, there is again a split in the decisions as to whether the insured has a right of subrogation against the bailee on the basis of his contractual obligation to the bailor. In England subrogation is permitted, *North British Mercantile Insurance Co. v. London, Liverpool & Globe Co.*, 5 *Ch. D.* 569 (1877), and likewise in the United States in

*Agricultural Insurance Co. v. Constantine,* 144 *Ohio St.* 275, 58 *N. E.* 2d 658 (*Sup. Ct.* 1944) and *National Fire Insurance Co. v. Mogan,* 186 *Or.* 285, 206 *P.* 2d 963, 968 (*Sup. Ct.* 1949), where the action was said to be " 'tort arising out of contract.' "

Where the lessee by contract agrees to pay for any loss by fire, the insurer is subrogated to the contractual rights of the lessor against the lessee in England, *Darrell v. Tibbitts,* 5 *Q. B. D.* 580 (1830), and generally in the United States, *F. H. Vahlsing, Inc. v. Hartford Ins. Co., supra,* 108 *S. W.* 2d 947; *Continental Ins. Co. v. I. Bahcall, Inc., supra,* 39 *F. Supp.* 315; *Chicago, St. Louis & New Orleans Railway Co. v. Pullman Southern Car Co., supra,* 139 *U. S.* 79, 11 *S. Ct.* 490.

It is important to note that where recovery is permitted in the various classes of subrogation based on the several kinds of contract claims just discussed in favor of an insurer as distinguished from a surety, the courts do not require a showing by the subrogee of a superior equity, but rather allow recovery as long as the conduct of the insurer and the insured has not been such as to make the granting of relief unconscionable. The insurer steps into the shoes of the insured and can through subrogation enforce the contractual obligation of the third party.

When we turn, however, from subrogation in insurance and related matters to cases involving a surety who has discharged his contractual obligation to the insured and seeks subrogation against a third-party obligor, we discover a conflict of decisions in the United States. There is considerable authority holding that subrogation will be permitted only where the surety company shows a "superior equity" to that of the third-party obligor. In *Meyers v. Bank of America, N. T. & S. Association,* 11 *Cal.* 2d 92, 77 *P.* 2d 1084, 1089 (*Sup. Ct.* 1938), the plaintiff's office manager received checks payable to the plaintiff, forged the payee's endorsement thereon and converted the funds to his own use. The third party to whom the checks were negotiated deposited them in his account in the defendant bank and they were presented

to the drawee and collected in the usual course of business. The bonding company paid all of the plaintiff's losses and then sought subrogation against the third-party depositor and the bank, based on the assignment of the plaintiff's right of action against these defendants. After first stating that any right of the bonding company was based on subrogation and that the assignment was of no effect, the court denied recovery saying:

"As stated hereinbefore, the right to maintain an action of this kind and to a recovery thereunder involves a consideration of, and must necessarily depend upon the respective equities of the parties. Here, the indemnitor has discharged its primary contract liability. It has paid what it contracted to pay, and has retained to its own use the premiums and benefits of such contract. It now seeks to recover from the bank the amount thus paid. It must be conceded that the bank is an innocent third party, whose duty to the employer was based upon an entirely different theory of contract, with which the indemnitor was not in privity. Neither the indemnitor nor the bank was the wrongdoer, but by independent contract obligation each was liable to the employer. In equity, it cannot be said that the satisfaction by the bonding company of its primary liability should entitle it to recover against the bank upon a totally different liability. The bank, not being a wrongdoer, but in the ordinary course of banking business, paid money upon these checks, the genuineness of which it had no reason to doubt, and from which it received no benefits. The primary cause of the loss was the forgeries committed by the employee, whose integrity was at least impliedly vouched for by his employer to the bank. We cannot say that as between the bank and the paid indemnitor, the bank should stand the loss. * * * Our conclusion, as hereinbefore has appeared, is that since the bonding company had no superior equities, it was not entitled to be subrogated to any claim plaintiff might have had against the bank." (77 *P.* 2*d* 1084, at *page* 1089)

In *United States Fidelity & Guaranty Co. v. First National Bank in Dallas, Texas,* 172 *F.* 2*d* 258 (*C. C. A.* 5 1949) an employee of the insured company had caused a number of checks to be issued payable to various individuals, upon which he forged the endorsements of the payees, cashed the checks and converted the proceeds to his own use. The defendant, the company's depository bank, paid the checks on presentation and charged them to the company's account. The plaintiff surety, after reimbursing the company on its

surety bond, brought suit against the depository bank on the theory that it was subrogated to the rights of the company against it. The District Court entered judgment for the defendant and the Court of Appeals affirmed, holding first that the bonding company suing in the company's right was barred by its election of remedies since it sought reimbursement from the bonding company instead of proceeding against the depository bank. The court admitted, however, that there was no Texas law on this subject and then proceeded to the second ground for its decision, saying:

"Subrogation is an equitable remedy, and, while a surety may become subrogated to the rights and remedies of the creditor against a third person, he stands, with respect to the right of recovery against a third person, upon a different footing from that upon which he would stand with respect to the right to recover from a principal. With respect to recovery from a principal, the right is absolute; as to a third person, it is conditional. Since subrogation seeks to place the charge where it ought to rest, by compelling payment by him who in equity owes it, such right will generally not be enforced against a third person where the equities of such third person are equal or superior to those of the surety in respect to the liability. * * *

We are unable to see any particular in which the equities of the bonding company are superior to those of the drawee bank. Neither one was guilty of negligence so far as the record shows. The bonding company, for a consideration, guaranteed the faithful conduct of employees of the Pipe Line Co., hence enabled Beall to hold the position of trust which he occupied. The bank was acting consistently with banking business in paying checks the genuineness of which in all particulars it had no reason to doubt. The bank did not participate in Beall's wrongdoing; it was in no wise responsible for his default. Notwithstanding its innocence, its liability to the Pipe Line Co. was occasioned by Beall's fraud. Subrogation in behalf of a surety 'is never applied against an innocent person wronged by the principal's fraud.'" (at 263)

To the same effect see *American Surety Co. v. Bank of California*, 133 *F. 2d* 160 (*C. C. A.* 9 1943); *Washington Mechanics Savings Bank v. District Title Insurance Co.*, 62 *App. D. C.* 194, 65 *F. 2d* 827 (*C. A. D. C.* 1933); *Bell v. Greenwood*, 229 *App. Div.* 550, 242 *N. Y. S.* 149 (*Sup. Ct. A. D.* 1930), 137 *A. L. R.* 700.

In the *Restatement of the Law of Security,* section 141, *comment* (*c*), the matter is left open:

"Where others than the principal and the surety are liable to the creditor for the principal's default, and the surety has satisfied the duty of the principal, the surety is subrogated to the creditor's rights against the others, if and to the extent that such subrogation is equitable, taking into account the position of the creditor and that of the others. The circumstances where others may have a liability to a creditor for the principal's default are of infinite variety. The rule stated in Clause (c) is limited to the situation where a person by negligence or willful conduct shares responsibility for the principal's default and thus contributed to the cause for the surety's liability. The rule so stated does not carry the negative inference that there are not other cases where the surety is subrogated either to the creditor's entire right against others or to the extent that the surety can compel contribution."

On the other hand, there is authority for the proposition that as between the surety and the innocent third party the surety should prevail without the necessity of proving a "superior equity." In *National Surety Co. v. National City Bank,* 184 *App. Div.* 771, 172 *N. Y. S.* 413 (*Sup. Ct. A. D.* 1918), an employee in the office of the Chamberlain of the City of New York caused checks of his employer to be made payable to fictitious persons, endorsed the name of the fictitious payee and cashed the checks at various stores. The checks passed through various banks and were ultimately paid by the defendant depository bank. The plaintiff as surety on the empoyer's bond paid the amount of the loss and then claimed subrogation against the bank upon its implied contract to pay out moneys only as directed by the city. Recovery was permitted even though there was no evidence of negligence or wrongdoing on the part of the defendant bank. In *Liberty Mutual Insurance Co. v. First National Bank of Dallas,* 245 *S. W. 2d* 237 (*Tex. Sup. Ct.* 1951), the plaintiff maintained an account in the defendant bank. The bonding company had issued its fidelity policy to the plaintiff and was forced to make payment thereon because of the fraudulent activities of one of the latter's employees, who by inventing fictitious claims caused plaintiff to make checks payable to fictitious persons and also to persons to whom it was not

indebted. The checks were cashed by the employee and ultimately were honored by the depository bank. The bonding company sued the bank in the plaintiff's name, claiming subrogation by assignment to the company's action against its depository bank. Prior endorsers were brought in as parties by the bank and others who were endorsers on the checks. In disposing of various defenses asserted by the defendants the court held that there was no negligence on the part of the company which would bar this action because under Texas law a depositor was under no duty to examine the signatures of payees on cancelled checks, and also because even by the use of reasonable care the forgeries could not have been discovered. It held, contrary to the *United States Fidelity & Guaranty Co.* case, *supra*, 172 *F*. 2d 258, that there was no election of remedies here so as to bar this action, and further that the checks were not bearer instruments because there was no evidence that the company or the person drawing the check knew that the payees were fictitious persons. Judgment was entered for the plaintiff while prior endorsers were held liable to subsequent endorsers. Apparently neither the parties nor the court felt that it was necessary for the surety company to show a superior equity, because the point was never discussed in the opinion. In *Royal Indemnity Co. v. Poplar Bluff Trust Co.*, 223 *Mo. App.* 908, 20 *S. W.* 2d 971, 974 (*Ct. App.* 1929), plaintiff had issued its policy insuring the Union Central Life Insurance Company against loss by reason of forgery of the name of any payee upon its checks. One of the checks was issued by the company payable to one U. S. King, drawn on the Liberty National Bank. The company mailed the check to its agent in St. Louis for delivery to King, but the agent forged the payee's name and presented the check to the defendant bank for payment. The defendant paid the amount, endorsed and negotiated the check to the order of the Mississippi Valley Trust Company; the check was then paid through normal clearing house channels. Plaintiff paid the Union Central Life Insurance Company $3,000 on account of its loss and then brought this action against the defendant bank claiming

subrogation rights by virtue of an assignment. The jury returned a verdict against the defendant and on appeal the Court of Appeals affirmed, saying:

"Since we think the testimony as to the issuance of the policy of indemnity by the plaintiff, and the payment thereunder on account of the forgery, was sufficient to be submitted to the jury, and since the written assignment of the interest of the Union Central Life Insurance Company had been made to the plaintiff, we must hold that the plaintiff was properly subrogated to the rights of the Union Central Life Insurance Company. *Krug v. Bremer*, 316 *Mo.* 891, 292 *S. W.* 702, 707; *Plate Glass U. Mutual Insurance Co. v. Ridgewood Realty Co.*, 219 *Mo. App.* 186, 269 *S. W.* 659."

See also *Borserine v. Maryland Casualty Co.*, 112 *F. 2d* 409 (*C. C. A.* 8 1940).

Thus there are two views on this question—the one represented by the *Meyers* and *United States Fidelity & Guaranty Co.* cases requiring a "superior equity" before subrogation is permitted, the other typified by the *Liberty Mutual* and *Royal Indemnity* decisions where subrogation is permitted simply on the basis of the contractual obligation of the defendant. In the first line of cases the courts justify their position on the ground that as between "two innocent parties," meaning the insurer and the third-party obligor, the former should bear the loss, because by reimbursing the insured for its losses it is merely doing something for which it has been paid by the insured and it therefore should not be permitted to recover money which it has disbursed in fulfillment of its contractual obligation as surety. Since this view is obviously contrary to the majority rule in the various types of insurance cases, the courts following the "superior equity" rule have attempted to distinguish the cases arising on insurance policies on the ground that in those cases the insurance company as subrogee is enforcing a "primary liability" of the third party, while in the suretyship case the primary liability rests on the defaulting employee (here Pellecchia) and not on the third party, *American Surety Co. v. Bank of California, supra*, 133 *F. 2d* 160, 164. Having discussed the several lines of decisions, we turn to a consideration of the

possible solutions on the merits of cases where a surety's action in subrogation against the third party is based on his contractual liability to the insured. They are three in number:

(1) To prohibit recovery by the surety against the third person, who is thus in effect given the benefit of insurance on which he has not paid any premium and where there is no direct contractual or other relationship between him and the surety.

(2) To allow the insured to recover from both the surety and the third party and thus to be doubly indemnified—a situation which the law has always deemed contrary to public policy not only by reason of its unfairness but because of its incitement to fraud.

(3) To give the surety the benefit of the contractual obligation of the insured against the third party by allowing subrogation. It is objected that such a recovery by the surety constitutes a "windfall" in that in the event of such recovery the surety suffers no loss on its surety bond although it has been paid premiums by the insured to reimburse it against just such a loss, as here. This argument loses sight of two fundamental facts: first, that even if the surety recovers against the third party on subrogation it still has been put to the expense of paying agent's commissions on the writing of its bond, to the necessity of investigating the insured's claim and of settling or litigating it, and, second, that the amounts of recoveries by subrogation are taken into consideration in arriving at the amount of premiums to be charged for surety bonds.

We adhere to the third alternative and give the surety the benefit of the insured's contractual rights against the third person, first, because it is sound in principle, giving force to the contractual relations of the several parties and, second, because it is in harmony with the rule adopted in this State in all other forms of insurance with respect to subrogation. But it must be remembered that subrogation is of equitable origin and enforced on equitable principles, albeit in most instances by suit at law, and therefore our acceptance

of the rule in suretyship cases is subject to the equitable principle that the third-party defendant (Federal) can bar a recovery by the surety subrogee (Standard) on the insured's contract with the third-party defendant by showing unconscionable conduct on the part of the insured (Columbus) or its subrogee (Standard). Under our former practice this might have been done by a separate suit in Chancery asserting the alleged unconscionable conduct of the plaintiff subrogee as the basis of its bill to enjoin the suit at law, but now under our modern practice the third-party's (Federal's) claim in equity is set up by way of defense in the law action. But if it appears that neither Columbus nor Standard is guilty of unconscionable conduct in the light of the evidence developed at the trial, then Standard is entitled to recover on Columbus' contractual rights against Federal.

The guaranty of prior endorsements is required by clearing houses generally in the orderly conduct of banking business in order that the collecting bank may be held liable by the drawee bank for the validity of all prior endorsements. Such a guaranty is a business risk assumed by the collecting bank for the benefit of subsequent endorsers and especially for the benefit of the drawee bank, which ordinarily has no way of ascertaining whether the endorsements are genuine and which accordingly relies upon the guaranty in honoring checks presented to it. It is a risk undertaken by the collecting bank in the usual course of business with full knowledge of its potential liability and possible ensuing loss. Against the possibility of such loss it generally insures itself, as here, where Federal insured itself with Commercial Casualty. By its endorsements of the checks in question it has rendered itself subject to contractual liability by reason of the forgeries just as clearly as did the lessee and bailee in the insurance cases heretofore cited. In both the cases based on a guaranty of check endorsements and the cases where a lessee or bailee, either expressly or by operation of law, assumes a contractual obligation, there is no reason why the third-party obligor should not be held to its contract created as a result of its having undertaken a business risk.

The insured and the endorsing bank each entered into a contractual obligation as a part of a business risk and each is required to fulfill its obligation, unless, of course, the third-party defendant (Federal) proves unconscionable conduct.

It is admitted that if Columbus had not been indemnified for its loss by the surety, it could have recovered from Federal on the basis of the latter's guaranty of check endorsements. If Columbus had not been covered by insurance, or if it had decided for one reason or another not to collect from the insurance company, it could have assigned its claim to another party who could have enforced it against Federal. Indeed, that is exactly what Columbus did for the F. D. I. C. after the discovery of Pellecchia's fraud, though later the F. D. I. C. reassigned the claim to the liquidating agents of Columbus.

It would seem that the cases denying subrogation to a surety of its insured's contractual right against a third party are unrealistic in ignoring the fact that the third party itself is generally insured by another surety or casualty company against losses caused by the neglect of its officers or employees as in this case where the Commercial Casualty had given its bond to Federal for $200,000. In states which follow the criticized rule the surety or insurer of the third party, here the Commercial Casualty, would go free of obligation. These cases are also unrealistic in implying a "superior equity" in favor of the third-party defendant where a court of equity did not find any unconscionable conduct at all. As applied in the surety-subrogee cases discussed herein the phrase is mere language devoid of meaning.

It has been suggested that there should be contribution between the subrogee on the one hand and the third-party obligor and its surety on the other, *King, supra,* 30 *Tex. L. Rev.* 62, 83; *Langmaid, supra,* 47 *Harv. L. Rev.* 976, 979, *Note,* 35 *Va. L. Rev.* 647, 649. Although this doctrine has been applied as between two insurance companies in cases involving damage to property insured by separate insureds, *Dixey v. Federal Compress & Warehouse Co.,* 140 *F.* 2d 820 (*C. C. A.* 8 1944), to our knowledge it has never been applied

in a subrogation case involving contractual liability, probably because of the lack of any contractual relations between the two sureties, and possibly because of the procedural difficulties. In any event, the idea of contribution flies in the face of the plain contractual rights and obligations of the respective parties.

The judgment below is reversed and the case is remanded for trial.

*For reversal*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, BURLING, JACOBS and BRENNAN—6.

*For affirmance*—None.