766 A.2d 321

AMERICAN RELIANCE INSURANCE COMPANY A/S/O PADDING-TON SQUARE AT MAHWAH CONDOMINIUM ASSOCIATION, INC., PLAINTIFF–APPELLANT, v. K. HOVNANIAN AT MAHWAH IV, INC., AND K. HOVNANIAN ENTERPRISES, DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued January 17, 2001—Decided February 2, 2001.

Before Judges PRESSLER, KESTIN and CIANCIA.

*Mauro C. Casci* argued the cause for appellant, (*Eli L. Eytan,* on the brief).

*Jonathan W. Philipp* argued the cause for respondents, (*Greenbaum, Rowe, Smith, Ravin, Davis & Himmel,* attorneys; *Dennis A. Estis,* of counsel; *Mr. Philipp,* on the brief).

The opinion of the court was delivered by

PRESSLER, P.J.A.D.

Plaintiff American Reliance Insurance Company, the casualty insurer of Paddington Square at Mahwah Condominium Association, Inc. (Association), appeals from a summary judgment dismissing its subrogation action against defendant K. Hovnanian at Mahwah IV, Inc. (Hovnanian), the sponsor and developer of the condominium project.[1] We affirm. We are satisfied that nothing in this record presents a factual dispute whose resolution would deprive Hovnanian of the benefit of the releases given it by the Association.

These are the undisputed facts. The condominium project consists of 39 separate frame buildings containing a total of 510 residential condominium units. In January 1994, prior to Hovna-

---

[1] The action had been filed by LMI Insurance Company, American Reliance's predecessor.

nian's complete turnover of the project to the Association and the termination of its responsibility, a severe snow and ice storm caused substantial roof and interior damage. The Association, without notice to or advice by Hovnanian, contracted with Brennan Building Services Company to repair the damage. Brennan apparently diagnosed the problem as involving the gutters and leaders, which it removed and replaced as well as removing ice and snow from the roofs.

At some point thereafter, the Association made a claim under its American Reliance policy for the cost of Brennan's work. In the meantime, Hovnanian assessed the damage and concluded that the roof damage and resulting interior damage left by the storm were not attributable to the gutters and leaders but rather to initial defective roof construction. Hovnanian so advised the Association. Hovnanian elected, however, to undertake the necessary roof and interior repairs at substantial cost to it, reserving its rights against its contractors, subcontractors, architect and engineer, as well as Brennan, who, it claimed, had exacerbated the damage to the roof by its workmen's use of the tools they had employed to remove the ice and snow. Hovnanian's litigation against these parties ensued.

In any event, after receiving the Association's "Brennan" claim, the insurer referred the claim for adjustment to Decker Associates. A letter dated November 2, 1994, to American Reliance from Decker's adjustor assigned to the claim, appears in the record. The letter first refers to the fact that both Decker and American Reliance had closed their respective files on the Association's claim the preceding August. There is no further reference to why that was done but it is at least clear that as of that time no payment had been made by American Reliance to the Association. The letter then goes on to repeat Hovnanian's position as aforestated, that is, its undertaking of roof and interior repairs at its expense and its declination of any responsibility for the gutter and leader work for which it disclaimed responsibility on the ground that it had been unnecessary. Although the adjustor made clear

to American Reliance that the gutter and leader removal and replacement had really been, insofar as it was able to determine, not repair work but rather "preventative work," it nevertheless recommended compromise of the claim and payment to the Association of the sum of some $113,000, representing covered reimbursement to the Association of its payments to Brennan. The Association was willing to accept this sum with some stated reservation and in December 1994 submitted a proof of loss to that extent giving back to American Reliance a subrogation receipt by which it subrogated American Reliance to "all of the rights, claims and interest which the undersigned may have against any person . . . liable for the loss. . . ." It is undisputed that American Reliance did not advise Hovnanian of the payment it had made at that time and, indeed, did not do so until nearly four years later. The only other event of 1994 warranting mention was a letter written by Hovnanian to American Reliance in March 1994, in support of the Association's request that the insurance be renewed. The letter advised that it, Hovnanian, was undertaking the necessary remedial work.

In 1996, the bulk of Hovnanian's consolidated litigation arising out of the 1994 storm damage, to which the Association had apparently been made a party and of which American Reliance claims to have had no knowledge, was settled. In connection with that settlement, the Association and its then insurer, Merrimack Fire Insurance Company, gave Hovnanian a general release executed in October 1996 releasing Hovnanian, without any specificity, from all claims and rights it might have in the litigated transactions. In February 1998, the Association and Hovnanian entered into a Condominium Transition Agreement and Release by which, among other provisions, Hovnanian agreed to undertake specified further roof and dryer vent repairs, and the Association released Hovnanian from all claims arising out of Hovnanian's development and sponsorship of the project. As in the case of the 1996 litigation release, there was no mention of the gutter and leader removal and replacement undertaken by Brennan.

There matters stood until September 1998, when American Reliance's attorney wrote to Hovnanian asserting its subrogation rights stemming from its December 1994 payment to the Association of the compromised cost of Brennan's gutter and leader work. American Reliance based its claim on the contention that that work had been necessitated by Hovnanian's negligence. Hovnanian's refusal to pay the claim resulted in the filing of this action by American Reliance in November 1998. Among its other affirmative defenses, Hovnanian asserted that the releases given it by the Association immunized it from American Reliance's subrogation claim. It successfully moved for summary judgment dismissing the complaint on that ground, and American Reliance appeals.

The rule is well settled that although a release of the tortfeasor by the victim-insured will ordinarily bar the insurer's subsequent assertion of a subrogation claim against the tortfeasor, the tortfeasor is not entitled to that immunization if he was on notice, at the time of the release, that the insurer had already paid the claim and hence had a subrogation right against him. As stated by *Melick v. Stanley,* 174 *N.J.Super.* 271, 282, 416 *A.*2d 415 (Law Div.1980), *aff'd o.b.,* 181 *N.J.Super.* 128, 436 *A.*2d 954 (App.Div.1981), "[a] release procured by a tortfeasor, knowing that the insured has already received payment from the insurer, has generally been held not to constitute a defense to the insurer's action against the wrongdoer to enforce its right of subrogation." The application of this rule requires the insurer's actual payment of the insured's claim since it is not, of course, until the insurer has made payment of the insured's claim that its right of subrogation against the tortfeasor arises. *Providence Washington Ins. Co. v. Hogges,* 67 *N.J.Super.* 475, 478–479, 171 *A.*2d 120 (App.Div. 1961); 6A *Appleman, on Insurance,* § 4051 at 103 1972). Hence, it is not until the tortfeasor knows or is chargeable with knowledge that a claim has been paid that he can be charged with having knowingly impaired the insurer's subrogation right since the insurer has no subrogation right until that time. The policy underlying the rule is self-evident. It averts the fraud of the

insurance company that would otherwise result and prevents the insured from obtaining a double recovery. *See generally Standard Accident Ins. Co. v. Pellecchia,* 15 *N.J.* 162, 174–175, 104 *A.*2d 288 (1954); *Melick v. Stanley, supra,* 174 *N.J.Super.* at 283, 416 *A.*2d 415; 6A *Appleman, supra,* § 4092 at 246–250.

■ The question then before us is whether there is anything in this record to support an inference that Hovnanian knew, either actually or constructively, at the time it accepted the 1996 release or the 1998 release from the Association, that American Reliance had paid the Association's "Brennan" claim in December 1994. American Reliance asserts that Hovnanian must have known before the claim was paid that the Association had made some kind of property loss claim against its carrier. It argues that Hovnanian's letter to it of March 1994 as well as its communications with its adjustor later that year but before payment of the claim indisputably so indicate. Although that may well be so and while Hovnanian might be chargeable with knowledge of some kind of claim having been made rather than merely a notice given by the Association to the carrier that a loss had occurred, that knowledge does not automatically translate into knowledge that a claim for which it was or might be responsible had actually been paid.

■ We reject American Reliance's contention that Hovnanian is chargeable with knowledge of its 1994 payment to the Association because, had Hovnanian made inquiry of the insurer, it would have readily determined that fact. We are satisfied that Hovnanian did not, under the circumstances here, have a duty of inquiry. That is so because both the tortfeasor and the insurer were perfectly aware of each other's involvement from the outset. That is, American Reliance knew of Hovnanian's potential status as a tortfeasor from the beginning and well before it paid the claim, and Hovnanian was well aware of American Reliance's status as the insurer covering the Association's claim. While it is true that Hovnanian made no inquiry of American Reliance respecting payment of the claim, it is also true that American

Reliance, for a period of almost four years after payment and not until well after the releases were executed, failed to assert its subrogation right against Hovnanian. In this posture, we agree with the conclusion reached in *Aetna Cas. & Sur. Co. v. Norwalk Foods, Inc.*, 125 *Misc.*2d 986, 480 *N.Y.S.*2d 851, 854 (Civ.Ct.1984), namely, that as a matter of policy the burden should be placed on the subrogee to assert its right of subrogation against the tortfeasor rather than placing the burden on the tortfeasor to inquire as to whether a subrogation right exists. After all, it is the subrogee who has the certain knowledge that payment was made and consequently has the means at hand to protect itself by the simple expedient of so advising the tortfeasor.

As made clear by Chief Justice Vanderbilt in *Standard Accident Ins. Co. v. Pellecchia, supra*, 15 *N.J.* at 171–172, 104 *A.*2d 288, subrogation is a device of equity to compel the discharge of an obligation by one who in good conscience ought to pay it, and even where contractually provided for, is subject to enforcement under equitable principles. There is no justification here for American Reliance's failure to have given timely notice of its subrogation right to Hovnanian. Moreover, the impairment of any right American Reliance may have had against it cannot reasonably be deemed to have been a motivating consideration in Hovnanian's bargaining for the Association's releases. The first release was given as part of the overall settlement of litigation that does not, on the record before us, seem to have directly implicated the gutter and leader removal and replacement that was the subject of American Reliance's payment to the Association. The second release was given as part of the final turnover of the project by Hovnanian to the Association. In other words, both releases primarily involved different and more substantial aspects and consequences of the relationship between Hovnanian and the Association. Neither release mentioned the gutter and leader work, and there is nothing to indicate that any part of Hovnanian's consideration for either release took that work into account. This is particularly so since Hovnanian, from the outset, had accepted

responsibility for the damage it deemed fairly attributable to it, denying all along that Brennan's gutter and leader work was relevant to solving the problem. Thus, there appears, as well, to be no spectre of a double recovery by the Association.

We do not intend to imply that it is only the tortfeasor's actual knowledge of payment of the claim by the insurer that can ever defeat the protection of the release. Obviously, that protection is forfeited by a tortfeasor who knows that the claim against him is covered by an insurer and who accepts a release from the insured with fraudulent or collusive intent or in culpable disregard of the insurer's protectable interest in acquiring its subrogation rights. *See, e.g., Standard Accident Ins. Co. v. Pellecchia, supra,* 15 *N.J.* at 175, 104 *A.2d* 288 (noting that the settling tortfeasor "was aware of [the insurer's] interest and of its desire to be consulted in this matter . . . .") *See also, generally,* Annotation, *Rights and Remedies of Property Insurer As Against Third–Person Tortfeasor Who Has Settled With Insured,* 92 *A.L.R.*2d 102 (1963). There is nothing in this record suggesting that Hovnanian was guilty of any such intentional interference with American Reliance's subrogation rights.

We are thus persuaded, in the circumstances before us, that because there is no indication Hovnanian knew the claim was paid, it cannot be charged with having knowingly impaired the insurer's subrogation rights. In the end, American Reliance forfeited those rights by having failed timely to assert them.

The summary judgment appealed from is affirmed.