87 N.J. Super. 339 (1965)
209 A.2d 354
SHIRLEY H. FEASTER AND WILLIAM N. FEASTER, 3RD, BY HIS GUARDIAN AD LITEM, SHIRLEY H. FEASTER, PLAINTIFFS,
v.
OLD SECURITY LIFE INSURANCE COMPANY, A MISSOURI CORPORATION, DEFENDANT.
Superior Court of New Jersey, Law Division.
Decided April 15, 1965.
*341 Messrs. Powell & Davis (Mr. Paul R. Kramer, appearing), attorneys for plaintiffs.
Messrs. Feuerstein & Sachs (Mr. Allan Maitlin, appearing), attorneys for defendant.
WOOD, A.C., J.C.C. (temporarily assigned).
This is an action on a health and accident insurance policy. The facts are stipulated.
The infant plaintiff, William N. Feaster, 3rd, was, during the academic year 1961-1962 enrolled as a pupil in Grice Junior High School, a part of the public school system of Hamilton Township, Mercer County, New Jersey. Defendant Old Security Life Insurance Company issued to the Board of Education of Hamilton Township, for the academic year 1961-1962 a policy of insurance under which it insured the pupils of the public schools of the township against accidental injury. The policy provided for certain payments for accidental death, dismemberment and loss of sight and, in addition, for payment of medical, surgical, dental, nurse and hospital expenses incurred as the result of accidental injury. Insurance under the policy was available to pupils in the *342 public schools upon the payment of premiums, as therein provided. Such premium was paid by or on behalf of the infant plaintiff and a certificate of insurance was issued to him.
The policy and the certificate issued thereunder to the insured provided, inter alia, that the pupil was insured while traveling
"(a) directly and uninterruptedly to or from the Insured Person's home premises and the school for regular school sessions; not to exceed one hour before school begins and not more than one hour after the student is dismissed, or longer if school bus requires."
Normal school session hours at Grice Junior High School were 8:30 A.M. to 3:15 P.M.
On February 13, 1962 classes at the school ended as usual at 3:15 P.M. However, on that afternoon, following the end of classes, an interscholastic basketball game was played in the Grice gymnasium between the Grice team and a team from another school. A large majority of the Grice student body, including young Feaster, attended the game. Feaster held a student basketball ticket entitling him to admission to "all home games." The game on February 13 lasted until about 4:45 P.M., after which Feaster and other students started walking home. About 5:15 P.M., while directly on his way from the school to his home, Feaster was struck by an automobile and seriously injured. He was hospitalized at St. Francis Hospital in Trenton for a long period of time and subsequently underwent extended treatment at the Kessler Institute for Physiotherapy. The expenses of his care and treatment were extremely heavy. Plaintiff breaks them down as follows:

 Medical, surgical and hospital care ..... $11,597.40
 Nursing care ............................ 2,370.00
 Physiotherapy, diathermy heat treatments,
 manipulation and massage ................ 5,445.00

Besides the present claim, plaintiff made claim for damages against the persons involved in the accident in which he was injured, which claim was settled for the sum of $8,500.
*343 Notice of claim was duly and timely given to defendant company in accordance with the terms of the policy. Defendant denied liability under its policy. This suit followed.
Primarily, defendant denies all liability to plaintiff upon the ground that at the time of the happening of the accident, he was not covered under the terms of the policy. Should it be found that plaintiff was covered, defendant argues additionally that (a) its liability is limited to $5,000, and (b) defendant is subrogated to the claim of plaintiff against any third-party tortfeasor and, since plaintiff in fact made a settlement with a third-party tortfeasor, the amount of which exceeded the maximum coverage under the policy, plaintiff is thereby barred from any recovery against defendant.
The first question for decision, therefore, is whether the infant plaintiff was covered under the policy.
Defendant, in denying liability, argues that classes at the Grice school ended at 3:15 P.M. on the day of the accident; that the policy covered the boy while travelling "directly and uninterruptedly" from the school to his home, "not to exceed one hour before school begins and one hour after the student is dismissed * * *," that the accident happened at 5:15 P.M., which was more than one hour after the dismissal of school, and therefore, by the terms of the policy, coverage for that day was ended.
Plaintiff, on the other hand, argues that the limiting clause is not to be so narrowly construed; that following the end of classes he attended a school-sponsored interscholastic basketball game in the Grice School gymnasium; that the basketball game ended at 4:45 P.M.; that thereafter he promptly proceeded toward his home, and while on his way home was injured at 5:15 P.M., one-half hour after the end of the game.
In order to sustain defendant's position, the language of the policy must be construed to mean that coverage for a student "travelling" between school and his home only continues for one hour after the dismissal of classes. But that is not the language of the policy. The clause in question provides *344 for coverage while the student is traveling directly and uninterruptedly from home to school or from school to home, subject to a time limit "not to exceed one hour before school begins and not more than one hour after the student is dismissed, or longer if school bus requires." (Italics supplied)
The distinction in phraseology between the beginning and the end of the school day is noteworthy. The time limitation in the morning is one hour before school begins. On the other hand, the after-school limitation is one hour after the student is dismissed. The language makes perfectly plain that the parties contemplated that a student might not necessarily be dismissed at the end of classes and, moreover, that all students might not be dismissed at the same time.
When, then, did the dismissal of the plaintiff occur? Defendant argues that since classes ended at 3:15 P.M. and plaintiff was then at liberty to return home, the "dismissal" occurred at that time. The court cannot agree. The argument ignores the fact (generally well known and, in this case, clearly to be inferred from the stipulated facts) that school-sponsored activities, such as sports, drama, and the like, generally take place outside of class hours, commonly after the end of regular classes. Such activities are generally denominated "extra-curricular," but they nevertheless form an integral and vital part of the educational program. Participation in such activities including student attendance at athletic contests is actively encouraged, as was the case here.
Can it then be said that plaintiff was "dismissed" for purposes of this policy, merely because he was at liberty to return home at the end of classes for the day? The answer must be in the negative. Granted, as above stated, that he was permitted to leave school after classes, it does not follow that he was "dismissed." He was permitted and, more, he was actively encouraged, to remain at school for the game. Only after the game was over was he dismissed, i.e., required to leave the school premises and return to his home. The word "dismiss" may indicate permission to leave or it may indicate a requirement or order that the student leave. In the light *345 of the nature of the school program, which must have been considered when the policy was written, the latter meaning must be taken as applicable here.
When members of the public purchase policies of insurance, they are entitled to the broad measure of protection necessary to fulfill their reasonable expectations. They should not be subjected to technical encumbrances or hidden pitfalls, and their policies should be construed liberally in their favor, to the end that coverage is afforded to the full extent that any fair interpretation will allow. Kievit v. Loyal Protective Life Ins. Co., 34 N.J. 475 (1961); Allen v. Metropolitan Life Ins. Co., 44 N.J. 294 (1965). If the controlling language will support two meanings, one favorable to the insurer and the other favorable to the insured, the interpretation sustaining coverage must be applied. Doubts as to the existence of coverage must be resolved in favor of the insured. Mazilli v. Accident & Casualty Ins. Co., 35 N.J. 1 (1961); Maryland Casualty Co. v. New Jersey Manufacturers, &c., Ins. Co., 48 N.J. Super. 314, 320 (App. Div. 1958).
The purpose of the insurance here considered was to provide protection to students while at school and also while on their way to and from school. Attendance at school certainly includes participation in activities which are a part of the school program, and this, as has been said, is not generally and was not here limited to mere attendance at classes.
I conclude that plaintiff was not dismissed, for the purpose of the instant policy, until he was required, along with his fellow students, to leave the school premises at the conclusion of school activities in which he was permitted and encouraged to participate, in this case the attendance at the basketball game. It follows that since the accident happened well within the time limit imposed and while plaintiff was concededly directly on his way home, he was covered by the policy issued to him.
There next arises the question of the extent of the coverage.
*346 The policy provides certain specific benefits payable upon the death or maiming of the insured and, as to benefits in general, provides as follows:
"If the Insured by reason of any covered injury shall require, within thirty days following the date of the accident, any necessary services of a graduate nurse, holding the degree of R.N., care or treatment by a legally licensed Physician or Surgeon, the Company will pay for such reasonable and necessary services, provided, however, that in the event of injuries not requiring surgical operations, the Company's liability, covering all items of expense (except as otherwise provided herein), shall be limited up to $5.00 for the initial visit, treatment and care and $4.00 for each subsequent visit, treatment and care with respect to such Physician or Surgeon. Surgical operation resulting from any injury covered by this Policy will be paid in accordance with the usual and customary charge normally made within the area in which such treatment is administered. If the Insured shall, within thirty days from the date of such injury, require any necessary hospital care or service, the Company will pay such expense incurred, provided, however, that the Company's maximum liability for Medical, Surgical and/or Hospital care shall not exceed a maximum of $5,000.00 and provided that such expense shall be incurred within fifty-two weeks from the date of such injury. Expense for physiotherapy, diathermy, heat treatment in any form, manipulation or massage will be payable only when such treatment is performed in the hospital. X-rays, in the event that there is no fracture, will be payable up to $5.00. If a fracture is present, the Company will pay the expense incurred for all such necessary X-rays."
Here it is to be noted that the quoted paragraph provides first for the actual expenses which the company will pay. There are limits imposed on payments for nonsurgical services. Surgical operations are to be paid for at local rates and hospital expenses actually incurred are to be paid. Then follows the following proviso:
"* * * provided however that the company's maximum liability for Medical, Surgical and/or Hospital Care shall not exceed a maximum of $5,000.00 * * *. Expense for physiotherapy, diathermy, heat treatment in any form, manipulation or massage will be payable only when such treatment is performed in the hospital."
Plaintiff contends that the quoted paragraph places a limitation only upon medical, surgical and/or hospital care, and no limitation at all upon nursing care or physiotherapy treatments. *347 Defendant, on the other hand, contends strenuously that the paragraph, read as a whole, clearly limits its liability to a maximum total of $5,000.
The court is constrained, on this point, to agree with the defendant. A careful reading of the paragraph as a whole convinces me that its intent and clear purport are to reimburse plaintiff for certain expenses of care by physicians or nurses (whether or not such care is rendered in a hospital) at fixed rates  $5 for the first visit and $4 for each visit thereafter  and to pay going rates for surgery and hospitalization. The policy then explicitly provides that the company's maximum liability for medical, surgical and/or hospital care shall not exceed a maximum of $5,000. (There is a time limit provided with which we are not here concerned.) Although the punctuation of this paragraph is somewhat inartistic, it seems clear to me that its intent and purport are that the maximum liability proviso refers to all the benefit provisions which precede it, and not just to the preceding portion of the sentence in which it appears. The first clause of the sentence provides only for payment of hospital expense. Yet the limitation is on medical, surgical and/or hospital expenses. Services by a registered nurse are clearly medical services and are intended to be included within the compass of that term as used in the proviso. Cf. Travelers Insurance Co. v. Dickson, 66 F. Supp. 72 (D. Ct. S.D. Tex. 1946). It would be straining liberality of construction to the breaking point to hold that the services of a registered nurse are not medical services. The qualifications in the field of medicine required of registered nurses are second only to those required of physicians. The term "medical services" as here used clearly refers to services of nurses as well as doctors.
As to expense of physiotherapy, they are payable, if at all, only if performed in a hospital. They are, in effect, included as a part of hospital care. And this is so whether the "hospital" is a general hospital such as St. Francis, or a specialized institution such as the Kessler Institute. They therefore fall within the maximum liability proviso of $5,000.
*348 I therefore hold that the maximum benefits payable under the policy (the specific benefit provisions being inapplicable) are limited to $5,000.
It remains to consider whether plaintiff is barred from recovery by having made settlement with a tortfeasor in derogation of defendant's right of subrogation. The policy contains no agreement for the company to be subrogated to the rights of the insured against tortfeasors. It is clearly designed and intended to provide compensation with respect to injuries sustained by students covered by the policy and subject to its geographical and time limitations, entirely without regard to the right of the insured to recover against tortfeasors.
Defendant argues that the policy here is a true "indemnity policy." I cannot agree. The policy provides certain benefits to be payable on certain contingencies. The amount thereof is fixed by schedule or is governed by expenses incurred, and, in the latter instance, is limited, as I have held, to a maximum of $5,000. It provides limited insurance against loss by accidental personal injury, whether caused by third persons or not. It is not an indemnity contract but an investment contract in which the only parties concerned are the insurer and the insured or the beneficiary. 29A Am. Jur., Insurance, § 1727, p. 806. While it has indemnity features, payments thereunder are not governed by the actual amount of the loss but by the schedules set forth in the contract. See Vance on Insurance, 679.
In 46 C.J.S., Insurance, § 1209b(1), p. 157, it is said:
"In the absence of any stipulation to that effect in the policy, an accident insurance company which pays the stipulated indemnity for an injury sustained by an insured is not thereby subrogated to the rights of the insured against a third person whose negligence caused the injury * * *."
See also Powell v. Wagner, 178 F. Supp. 345 (D. Ct. E.D. Wis. 1959); and see Crab Orchard Improvement Co. v. Chesapeake & Ohio Ry. Co., 115 F.2d, 277 (4 Cir. 1940), where the court, distinguishing between accident insurance *349 and other forms of indemnity policies, recognized the rule that there is no subrogation in the former in the absence of agreement.
The rule and its rationale are lucidly set forth in 3 Appleman on Insurance, § 1675, p. 278 as follows:
"Subrogation rights are common under policies of property or casualty insurance, wherein the insured sustains a fixed financial loss, and the purpose is to place that loss ultimately upon the wrongdoer. To permit the insured in such instances to recover both from the insurer and the wrongdoer would permit him to profit unduly thereby.
In personal insurance contracts, however, the exact loss is never capable of ascertainment. Life and death, health, physical well being, and such matters, are incapable of exact financial estimation. There are, accordingly, not the same reasons militating against a double recovery. The general rule is, therefore, that the insurer is not subrogated to the insured's rights or to the beneficiary's rights under contracts of personal insurance, at least in the absence of a policy provision so providing. Nor would a settlement by the insured with the wrongdoer bar his cause of action against the insurer. However, if a subrogation provision were expressly contained in such contracts, it probably would be enforced quite uniformly. Such a provision cannot be read into a policy by calling it an indemnity contract, however. * * *."
The cases cited by defendant for the proposition that the insurer has subrogation rights even in the absence of agreement to that effect, all deal with various forms of property loss insurance, rather than personal injury accident insurance. Moreover, in Harter v. American Eagle Fire Ins. Co., 60 F.2d 245 (6 Cir. 1932), there was a subrogation clause in the policy.
It follows that since there is no subrogation clause in this policy, there is no right of subrogation.
For the foregoing reasons, the court concludes that judgment should be entered in favor of plaintiff and against defendant for the sum of $5,000, with interest from February 13, 1962 and costs.