778 A.2d 429

MARIA PERREIRA AND LUCIANO PERREIRA, PLAINTIFFS, v. MICHAEL C. REDIGER T/A, MCR HORTICULTURAL ENTER-PRISES AND THE PRESERVER INSURANCE COMPANY, AS INSURER FOR MICHAEL C. REDIGER T/A HORTICULTURAL ENTERPRISES, DEFENDANTS–APPELLANTS, AND OXFORD HEALTH PLANS (NJ), INC., DEFENDANT–RESPONDENT, AND COLUMBIA SAVINGS BANK AND/OR COLUMBIA SAVINGS BANK OR ITS INSURER, ATLANTIC MUTUAL INSURANCE COMPANY A/K/A CENTENNIAL INSURANCE COMPANY, DEFENDANTS.

LEONARD ACHOR, LENORE ACHOR AND PREFERRED MUTUAL INSURANCE COMPANY, AS INSURER FOR THE ACHORS, PLAINTIFFS–APPELLANTS, v. OXFORD HEALTH PLANS, INC., TAKAKO BENINATO AND MICHAEL BENINATO, DEFENDANTS–RESPONDENTS.

Argued February 14, 2001—Decided June 26, 2001.

400

*Fredric Paul Gallin* argued the cause for appellants, (*Methfessel & Werbel*, attorneys).

*Scott S. Levinson* argued the cause for respondents Oxford Health Plans (NJ), Inc. and Oxford Health Plans, Inc.

*Frank P. Beninato, Jr.*, submitted a letter in lieu of brief on behalf of respondents Takako Beninato and Michael Beninato.

*Michael J. Cernigliaro* and *Stephen J. Foley, Jr.*, submitted briefs on behalf of amicus curiae New Jersey Defense Association (*Campbell, Foley, Lee, Murphy & Cernigliaro*, attorneys).

*Franklin P. Solomon* submitted a brief on behalf of amicus curiae Association of Trial Lawyers of America New Jersey (*Weitz & Luxenberg*, attorneys).

The opinion of the court was delivered by

LONG, J.

The question presented in these consolidated appeals is whether the collateral source rule embodied in *N.J.S.A.* 2A:15–97 allows a health insurer, who expends funds on behalf of an insured, to recoup those payments through subrogation or contract reimbursement when the insured recovers a judgment against a tortfeasor. The answer is no.

The purpose underlying *N.J.S.A.* 2A:15–97 is twofold: to eliminate the double recovery to plaintiffs that flowed from the common-law collateral source rule and to allocate the benefit of that change to liability carriers. Allowing health insurers to recover funds expended pursuant to an insurance contract either by way of subrogation or contract reimbursement would reallocate the benefit accorded by *N.J.S.A.* 2A:15–97 in contravention of the underlying legislative intent. Accordingly, we hold such recovery to be interdicted by the statutory scheme.

I

The Beninato case arose when Takako Beninato, a professional dog groomer, was seriously injured during a grooming session involving a dog owned by Lenore and Leonard Achor. Beninato's health insurer, Oxford Health Plans, Inc. ("Oxford"), paid $7,357 for her medical expenses. Beninato then sued the Achors, whose homeowner's insurance carrier, Preferred Mutual Insurance Company ("Preferred"), defended the suit.

While the underlying case was pending, the Achors and Preferred filed an action against Oxford, seeking a declaration that Oxford was barred by the collateral source statute, *N.J.S.A.* 2A:15–97, from asserting a subrogation or reimbursement remedy. That action was consolidated with the Beninatos' negligence action that settled for $95,000. The release expressly stated that "payment for medical bills and expenses incurred" are not included in that amount.

Oxford moved for summary judgment, arguing that if medical expenses were included in the settlement, it had a right to be reimbursed for what it expended on behalf of Beninato. If those expenses were not included in the settlement, then Oxford claimed a right to bring a subrogation action against the Achors for repayment. The Achors and Preferred argued that "the collateral source rule and the subrogation provision within [Oxford's] insurance contract conflict with each other." The trial court entered judgment for the Achors and Preferred, concluding that Oxford's claim was barred by the collateral source statute. Oxford appealed.

The Perreira case arose when Maria Perreira fell on the premises of the Columbia Savings Bank ("Columbia"). She sued Columbia along with its liability carrier Atlantic Mutual Insurance Company ("Atlantic"), Michael Rediger, the bank's snow removal contractor and Rediger's liability carrier, the Preserver Insurance Company ("Preserver"). In that case, Oxford, Perreira's health insurer, had paid about $13,000 for her medical expenses.

While that suit was pending, the Perreiras filed an action against Oxford, Columbia, Rediger, Atlantic, and Preserver, "seeking a declaration that Oxford was barred by the collateral source statute from either reimbursement or subrogation against the defendants." That action was consolidated with the Perreira's negligence action.

The Perreiras moved for summary judgment, arguing that under the collateral source rule, Oxford could not assert a lien on their recovery in the tort action. The trial court granted the motion and Oxford appealed. After the grant of summary judgment, the Perreiras entered into a settlement with Columbia and Rediger, the terms of which have not been disclosed.

The Appellate Division consolidated Oxford's appeals and reversed, holding that the collateral source rule does not bar the health insurer of a plaintiff in a non-PIP personal injury negligence action from asserting a claim for reimbursement from the plaintiff or subrogation against the tortfeasor. In so doing, the

court observed that its ruling "places the ultimate burden on the tortfeasor, where in fairness it belongs . . . ." *Perreira v. Rediger,* 330 *N.J.Super.* 455, 466, 750 *A.*2d 126 (2000).

The Appellate Division based its conclusion on two distinct grounds. One was Oxford's insurance contract that contained the following provision for reimbursement from the insured:

If a Member is injured or becomes ill through the act of a third party, Health Plan shall provide care for such injury or sickness. Acceptance of such services will constitute consent to the provisions of this section.

Upon providing care for such injury or sickness pursuant to the terms of this agreement, *Health Plan shall be permitted to recover the reasonable value of such care for injury or sickness, when payment is made directly to the Member in third party settlements or satisfied judgments.*

The Member shall cooperate fully to assist Health Plan in protecting its legal rights under this Part X.

[Emphasis added.]

The court also held that Oxford had a common-law equitable right of subrogation against the Achors and Rediger for the amount of money it spent due to their tortious conduct and that the silence of *N.J.S.A.* 2A:15–97 "on the subject of subrogation bespeaks its intention not to alter or affect that well-established common-law right." *Perreira, supra,* 330 *N.J.Super.* at 461, 750 *A.*2d 126. Thereafter, the court outlined a methodology to effectuate a health insurer's subrogation and contract reimbursement rights after trial and upon settlement. *Id.* at 465–66, 750 *A.*2d 126.

The Achors and Rediger filed a petition for certification that we granted. *Perreira v. Rediger,* 165 *N.J.* 491, 758 *A.*2d 650 (2000). We now reverse.

II

The Achors and Rediger argue that the collateral source rule, *N.J.S.A.* 2A:15–97, bars any action by Oxford either by way of contract reimbursement or equitable subrogation to obtain repayment of its health insurance payments to Beninato and Perreira and that the methodology adopted by the Appellate Division to provide for such repayment runs afoul of the statute.

Oxford counters that the collateral source rule was not meant to affect its pre-existing equitable right of subrogation against the tortfeasors who injured Beninato and Perreira or to limit its contract right of reimbursement from its insured and that the Appellate Division's scheme for effectuating those rights conforms with the statute.

The New Jersey Defense Association and the Association of Trial Lawyers, in a rare convergence of views, argue that the collateral source rule interdicts subrogation and contract reimbursement by health insurers.

### III

The collateral source rule, with deep roots in English common law, is firmly embedded in American common law as well. It was first cited in an American judicial decision in 1854 and has had continued currency in the centuries to follow. Michael F. Flynn, *Private Medical Insurance and the Collateral Source Rule: A Good Bet?*, 22 *U. Tol. L.Rev.* 39, 40 (1990)(citing *The Propeller Monticello v. Mollison*, 58 *U.S.* (17 How.) 152, 15 L.Ed. 68 (1854)). The common law collateral source rule "allows an injured party to recover the value of medical treatment from a culpable party, irrespective of payment of actual medical expenses by the injured party's insurance carrier. The purpose of the collateral source rule is to preserve an injured party's right to seek tort recovery from a tortfeasor without jeopardizing his or her right to receive insurance payments for medical care." *Ibid.* The rule "prohibits the tortfeasor from reducing payment of a tort judgment by the amount of money received by an injured party from other sources" and "bars the submission of evidence that the injured plaintiff received payment for any part of his damages, including medical expenses, from other sources." *Id.* at 42. It is thus a rule of damages as well as a rule of evidence. *Ibid.*

According to the *Restatement (Second) of Torts* § 920A(2) (1977), under the collateral source rule, payments made to an injured party by a source other than the tortfeasor are "not

credited against the tortfeasor's liability, although they cover all or a part of the harm for which the tortfeasor is liable." The policy advanced by the rule is that "a benefit that is directed to the injured party should not be shifted so as to become a windfall for the tortfeasor." *Id.* § 920A comment b. Thus, if an injured party has the foresight to provide that his or her medical expenses will be paid by maintaining an insurance policy, the common law collateral source rule allows him or her to benefit from that foresight by recovering not only the insurance proceeds but also the full tort judgment. *Ibid.*

However, in the early to mid–1980's, state legislatures began to revisit the collateral source rule based on the notion, advanced by insurance industry analysts, that the rule contributed "to the liability insurance availability and affordability crisis in this country. . . ." Christian D. Saine, *Note, Preserving the Collateral Source Rule: Modern Theories of Tort Law and a Proposal for Practical Application,* 47 *Case W. Res. L.Rev.* 1075, 1080 (1997). Indeed, in 1986, a report commissioned by the Attorney General of the United States and prepared by a governmental inter-agency working group and the White House recommended a series of initiatives to address "the rapidly expanding crisis in liability insurance availability and affordability." *Report of the Tort Policy Working Group on the Causes, Extent and Policy Implications of the Current Crisis in Insurance Availability and Affordability* 1 (Feb.1986). Included among those initiatives was the suggestion that tort judgments be reduced by collateral sources of compensation for the same injury. *Id.* at 70.

In response, many state legislatures passed comprehensive tort reform legislation in the latter half of the 1980's. Statutory modification of the collateral source rule in one form or another was a common factor among those different legislative initiatives. Christian D. Saine, *supra,* 47 *Case W. Res. L.Rev.* at 1075. No universal approach was adopted in all jurisdictions.

One common legislative reform to avoid double recovery to plaintiffs requires a tort judgment to be reduced by the amount

of collateral source payments but specifies that such reduction will not occur if a subrogation or reimbursement right exists.[1] *Alaska Stat.* § 09.17.070(a)(Michie 1998); *Colo.Rev.Stat. Ann.* § 13–21–111.6 (West 2001); *Conn. Gen.Stat. Ann.* § 52–225a (West 1991); *Fla. Stat. Ann.* § 768.76(1) (West Supp.2000); *Haw.Rev.Stat.* § 633–10 (1986), *Idaho Code* § 6–1606 (1998); 735 *Ill. Comp. Stat.* 5/2–1205.1 (West 1992); *Me.Rev.Stat. Ann. tit.* 24, § 2906 (West 2000); *Mich. Comp. Laws Ann.* § 600.6303 (West 2000); *Minn. Stat. Ann.* § 548.36 (West 2000); *Mont.Code Ann.* § 27–1–308 (West 2000), *Utah Code Ann.* § 78–14–4.5 (1953).

A second approach permits a plaintiff to introduce evidence at trial of collateral source benefits received, presumably to reduce the amount of the tort judgment and benefit liability carriers. *Cal. Civil Code. Ann.* § 3333.1 (West 2001); *Ga.Code Ann.* § 51–12–1 (West 2000). Within that category, contractual reimbursement is allowed and subrogation denied to the health insurers in some states. *Ga.Code. Ann.* § 33–24.56.1 (West 2000). In other states, contract reimbursement and subrogation are specifically prohibited. *Cal. Civil Code. Ann.* § 3333.1(b) (West 2001).

A third approach does not purport to tinker with the common-law collateral source rule at all, but simply creates a statutory right to subrogation for health insurers, thus eliminating double recovery to plaintiffs and benefitting the health insurance industry. *S.C.Code Ann.* § 38–71–190 (Law.Co-op.2000).

Each of the aforementioned initiatives has the effect of avoiding double recovery to plaintiffs and thus altering the effect of the common-law collateral source rule. However, they differ dramati-

---

[1] Subrogation substitutes the health insurer in place of the plaintiff insured "to whose rights he or she succeeds in relation to the debt and gives to the substitute all the rights, priorities, remedies, liens, and securities of the person for whom he or she is substituted." Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 222:5 (3d ed.2000).

Reimbursement, a contractual undertaking, allows the insurer to recover payments directly from its own insured upon its insured's recovery of the loss from a third party. *Couch on Insurance* 3d § 222:81.

cally regarding which segment of the insurance community will benefit from the change. Where subrogation or contract reimbursement rights are granted to health insurers, that industry is the beneficiary of the legislative modification. Where subrogation and reimbursement are prohibited, the liability carriers benefit.

Like other jurisdictions, New Jersey responded to the call for modification of the collateral source rule by enacting *N.J.S.A.* 2A:15–97 in 1987. Although, like the modifications enacted in other jurisdictions, its primary effect was to eliminate double recovery to plaintiffs, it was not modeled exactly on any of the other statutes. It provides:

> In any civil action brought for personal injury or death, except actions brought pursuant to the provisions of P.L.1972, c. 70 (C. 39:6A–1 et. seq.), if a plaintiff receives or is entitled to receive benefits for the injuries allegedly incurred from any other source other than a joint tortfeasor, the benefits, other than workers' compensation benefits or the proceeds from a life insurance policy, shall be disclosed to the court and the amount thereof which duplicates any benefit contained in the award shall be deducted from any award recovered by the plaintiff, less any premium paid to an insurer directly by the plaintiff or by any member of the plaintiff's family on behalf of the plaintiff of the policy period during which the benefits are payable. Any party to the action shall be permitted to introduce evidence regarding any of the matters described in this act.
>
> [*N.J.S.A.* 2A:15–97.]

On its face, *N.J.S.A.* 2A:15–97 eliminates double recovery by directing the court to deduct from any tort judgment the amount received by plaintiff from collateral sources (other than workers' compensation and life insurance) less any insurance premiums plaintiff has paid.[2] Unlike the out-of-state enactments, the statute is silent regarding any right to subrogation or reimbursement on the part of the health insurers.

The legislative history of the statute is instructive. The Senate Judiciary's Committee statement to the bill, then S. 2708, declared:

> The traditional 'collateral source rule' holds that damages awarded in a suit for personal injury or wrongful death should not be reduced because the insured

---

[2] The insurance premium is essentially charged to the liability carrier because the liability carrier, not the plaintiff, has received the benefit of the insurance.

claimant has received insurance proceeds or other compensation covering the same injuries. In effect a claimant is paid twice for the same injury.

[*Statement by Senate Judiciary Committee* (October 30, 1986).]

The Committee's comments made clear that S. 2708 "would eliminate the collateral source rule and require that *awards* for personal injury *be reduced* by any compensating benefits which the plaintiff has received from other sources." *Ibid.* (emphasis added).

The Assembly Insurance Committee statement to S. 2708 reiterated the Senate statement and noted a separate goal to be achieved by the amendment:

Generally, awards in civil suits are intended to compensate injured persons for such things as loss of wages, medical costs, and other costs which are attendant to the injury. To the extent that the injured party is being compensated for the same things from different sources there is double recovery on the part of the plaintiff. *This bill, by requiring that the benefits received from the other sources be offset against the award, is intended to effect cost containment.*

[*Statement by Assembly Insurance Committee* (Sept. 1, 1987)(emphasis added).]

Significantly, the Passed Bill memo prepared by Governor's counsel stated:

*This bill attempts to reduce the cost of liability insurance* by reducing the likelihood of a 'double recovery' in a liability award for items which were already compensated by insurance or by other 'collateral' sources, other than a tortfeasor.

[*Passed Bill Memo to Governor Thomas H. Kean* (Dec. 7, 1987)(emphasis added).]

That legislative history reaffirms the plain language of *N.J.S.A.* 2A:15–97 and underscores that it had more than one purpose. To be sure, its primary purpose was to disallow double recovery to plaintiffs, but a secondary goal was clearly the containment of spiraling insurance costs. The effectuation of no-double-recovery therefore required a separate legislative decision regarding which segment of the insurance industry would be the beneficiary of that disallowance. The Legislature had two choices: to benefit health insurers by allowing repayment of costs expended on a tort plaintiff, or to benefit liability carriers by reducing the tort judgment by the amount of health care benefits received.

As the legislative history reveals, the choice was made to favor liability carriers. *See Kiss v. Jacob,* 138 *N.J.* 278, 282, 650 *A.*2d 336 (1994) (stating that intent of the legislature was to control spiraling automobile-insurance costs); *Fayer v. Keene Corp.,* 311 *N.J.Super.* 200, 208, 709 *A.*2d 808 (App.Div.1998) (agreeing that purpose of statute is to shift burden to health industry); *Parker v. Esposito,* 291 *N.J.Super.* 560, 565, 677 *A.*2d 1159 (1996)(stating that purpose of collateral source statute is to prevent double recovery thereby giving relief from increasing costs of liability insurance); *Lusby v. Hitchner,* 273 *N.J.Super.* 578, 591, 642 *A.*2d 1055 (App.Div.1994)(stating that legislative determination "was apparently not only to prevent plaintiffs from obtaining a double recovery but also, except where PIP payments are involved, to shift the burden, at least to some extent, from the liability and casualty insurance industry to health and disability third-party payers"). That legislative determination took the form of a reduction from the tort judgment of the amount received from collateral sources. By that action, the Legislature eliminated double recovery to plaintiffs, reduced the burden on the tortfeasors' liability carriers and left health insurers in the same position as they were prior to the enactment of *N.J.S.A.* 2A:15–97.

## IV

One of Oxford's core claims is that health insurers had a common-law equitable right to subrogation that pre-dated *N.J.S.A.* 2A:15–97 and that that right has to be taken into account in interpreting the collateral source statute. The Appellate Division agreed, and held that the statutory silence on the subject of subrogation should be viewed as essentially importing the prior legal landscape into the scheme. The vexing question about the meaning of legislative silence may be avoided here because we find no evidence of a common-law equitable right to subrogation that pre-dated *N.J.S.A.* 2A:15–97.

Although courts have identified an implied right of subrogation under certain contracts of insurance, such an implied

equitable right has not been recognized with respect to all forms of insurance. Thus, for example, policies covering property damage such as fire insurance have regularly been held to include an implied right of subrogation. *Couch on Insurance* 3d § 222:25; *Feaster v. Old Sec. Life Ins. Co.*, 87 *N.J.Super.* 339, 349–50, 209 *A.*2d 354 (Law Div.1965), *aff'd*, 91 *N.J.Super.* 120, 219 *A.*2d 340 (1966); *Williams v. Erie Ins. Group*, 86 *Ohio App.*3d 660, 621 *N.E.*2d 770, 773 (1993); *Gatzweiler v. Milwaukee Elec. Ry. & Light Co.*, 136 *Wis.* 34, 116 *N.W.* 633, 634 (1908). But the same has not been true in the area of personal insurance, a category that includes health and medical insurance. *Couch on Insurance* 3d § 222:25; *Feaster, supra*, 87 *N.J.Super.* at 349–50, 209 *A.*2d 354.

Among the courts that have addressed the question of the existence of a common-law equitable right of subrogation, the weight of authority concludes that no such right exists in the health insurance field. *Couch on Insurance* 3d § 222:25, § 222:26; *American Pioneer Life Ins. v. Rogers*, 296 *Ark.* 254, 753 *S.W.*2d 530, 532–33 (1988)(stating that absent specific subrogation clause medical insurer has no right to share in proceeds of insured's settlement or recover from tortfeasor); *Schultz v. Gotlund*, 138 *Ill.*2d 171, 149 *Ill.Dec.* 282, 561 *N.E.*2d 652, 653–54 (1990)(holding that because no common law or equitable right to subrogation is recognized in group health policies, absent express subrogation clause in policy, group health insurer had no right to share in proceeds of personal injury settlement between insured and tortfeasor); *Frost v. Porter Leasing Corp.*, 386 *Mass.* 425, 436 *N.E.*2d 387, 389–90 (1982)(stating that insurer providing medical and hospital expense benefits had no right of subrogation in insured's recovery against tortfeasor or personal injuries when group policy contained no express provision entitling insurer to subrogation rights); *Michigan Hosp. Serv. v. Sharpe*, 339 *Mich.* 357, 63 *N.W.*2d 638, 641–42 (1954)(holding that equitable subrogation not allowed for health insurance contract); *Ridge Tool Co. v. Silva*, 33 *Ohio App.*3d 260, 515 *N.E.*2d 945, 946–47 (1986)(denying reimbursement because health insurer's contract did not expressly

provide for reimbursement in event of insured's recovery from tortfeasor); *Shumpert v. Time Ins. Co.*, 329 *S.C.* 605, 496 *S.E.*2d 653, 656–58 (Ct.App.1998)(holding that health insurance provider cannot obtain equitable subrogation of insured's recovery against third-party tortfeasor when it fails to include subrogation provision in health insurance policy); *Cunningham v. Met. Life Ins. Co.*, 121 *Wis.*2d 437, 360 *N.W.*2d 33, 38 (1985)(stating that group hospitalization and physician's services coverage contained in same contract with indemnity coverage is in nature of investment insurance and, absent subrogation clause, insurer who paid benefits under such policy was not equitably subrogated to insured's claims). *Compare Nossoughi v. Federated Dep't Stores, Inc.*, 175 *Misc.*2d 585, 669 *N.Y.S.*2d 479 (N.Y. County 1998)(collateral source rule did not prevent insured's health insurer from asserting equitable right to subrogation) *with* Vincent C. Alexander, *New York Civil Practice Law and Rules,* supplementary practice commentary on *N.Y.C.P.L.R.* 4545 (1999)(stating that "[t]he effect of CPLR 4545 on the subrogation rights of a health insurer who has reimbursed its insured remains unsettled").

The rationale behind the rule against finding equitable subrogation in personal insurance contracts is set forth in one treatise as follows:

> Subrogation rights are common under policies of property or casualty insurance, wherein the insured sustains a fixed financial loss, and the purpose is to place that loss ultimately on the wrongdoer. To permit the insured in such instances to recover from both the insurer and the wrongdoer would permit him to profit unduly thereby.
>
> In personal insurance contracts, however, the exact loss is never capable of ascertainment. Life and death, health, physical well being, and such matters are incapable of exact financial estimation. There are, accordingly, not the same reasons militating against a double recovery. The general rule is, therefore, that the insurer is not subrogated to the insured's rights or to the beneficiary's rights under contracts of personal insurance, at least in the absence of a policy provision so providing. Nor would a settlement by the insured with the wrongdoer bar his cause of action against the insurer. However, if a subrogation provision were expressly contained in such contracts, it probably would be enforced quite uniformly. Such a provision cannot be read into a policy by calling it an indemnity contract, however.
>
> [3 J.A. Appleman & J. Appleman, *Insurance Law & Practice,* § 1675 at 495–97.]

Thus, courts typically have not implied a non-contractual or non-statutory right to subrogation in health insurance.

We are satisfied that no equitable remedy of subrogation was available to health insurers in 1987, at the time *N.J.S.A.* 2A:15–97 was enacted. We reach that conclusion based on learned treatises and the weight of cited out-of-state authority to that effect, and on the complete lack of evidence that such a right was ever exercised. *See* William A. Krais & Michael C. Weiss, *Exploring the Ruins of the Collateral Source Rule After Perreira v. Rediger*, 160 *N.J.L.J.* 29, 33 (June 19, 2000)(indicating that attorneys and health insurers have never asserted any alleged equitable right to subrogation in personal injury litigation). Most significant to us, however, is that one of the core purposes of *N.J.S.A.* 2A:15–97, as conceded by all parties, was to avoid "double recovery" by plaintiffs. If, under the law existing prior to 1987 when the collateral source rule was amended, health insurers could equitably obtain repayment from tortfeasors for the health care costs they advanced to plaintiffs, then plaintiffs, in fact, would not have experienced double recovery and there would have been no point to *N.J.S.A.* 2A:15–97. In a word, double recovery occurs only when a plaintiff recovers not only the health insurance proceeds but also the full tort judgment. If health insurers had a common-law equitable right to be repaid out of a tort judgment for the health care costs they advanced to plaintiff, the entire notion of double recovery would not have existed. *Report of the Tort Policy Working Group on the Causes, Extent and Policy Implications of the Current Crisis in Insurance Availability and Affordability, supra* at 70. Thus, we have found no support for the proposition that health insurers had an equitable right of subrogation available under the common law.

V

We turn next to contract reimbursement. Oxford's policies contained a reimbursement provision allowing it to recover expended health care costs "when payment is made directly to the member in third-party settlements or satisfied judgments." That

contract provision was not authorized by law at the time the collateral source rule was amended in 1987. The Commissioner of Insurance refused to allow such provisions in health insurance contracts pursuant to his regulatory authority. 28 *N.J. Reg.* 2003(a)(April 15, 1996)(stating that prior to 1996 "all subrogation and third party liability provisions in [group health, blanket, and group life insurance] policy forms would have been disapproved"). Presumably, that decision mirrored the lack of a statutory or equitable right on the part of a health insurer to recover costs against a tortfeasor by way of subrogation.

In 1993, after years of declining to approve such provisions, the Department of Insurance allowed the inclusion of subrogation and reimbursement provisions in health insurance policies provided through the Small Employer Health Benefits Program and the Individual Health Coverage Program. *N.J.A.C.* 11:20 App. Exhibit F; *N.J.A.C.* 11:21 App. Exhibit F. Later, the Commissioner promulgated regulations that for the first time permitted such provisions in large group health insurance policies. *N.J.A.C.* 11:4–42.10.

■ Each of those rules set forth the requirements for contract provisions for subrogation and repayment of benefits. In the case of large group policies, for example, *N.J. Admin. Code tit.* 11:4–42.10 reads as follows:

> (a) Group policies and certificates providing health insurance may contain subrogation provisions or provisions that require the return to the insurer by a covered person of benefits paid for illness or injury up to the amount a covered person *receives* from a third party through settlement, a satisfied judgment or other means, as compensation for the medical costs of such illness or injury . . .
> [*N.J.A.C.* 11:4–42.10 (emphasis added).]

It is pursuant to that authority that the Oxford reimbursement provision was included in its contract. The question presented is whether, in light of *N.J.S.A.* 2A:15–97, the Commissioner's regulations exceeded his authority.

■ We generally accord a high degree of deference to administrative agency regulations that are consistent with the statutes and public policy of the state. *Parkway Ins. Co. v. New*

*Jersey Neck & Back,* 330 *N.J.Super.* 172, 182, 748 *A.*2d 1221 (Law Div.1998). However, "[n]o administrative agency has inherent power, and none may arrogate to itself the authority to accomplish ends not envisioned by the legislative grant or to employ means not fairly within the powers that have been bestowed." *Knight v. City of Hoboken Rent Leveling & Stabilization Bd.,* 332 *N.J.Super.* 547, 552, 753 *A.*2d 1231 (App.Div.2000). In short, an administrative code provision must give way if it is inconsistent with a state statute. *State v. Auringer,* 335 *N.J.Super.* 94, 102, 761 *A.*2d 102 (App.Div.2000).

 The Commissioner's authorization of subrogation and reimbursement provisions in health insurance contracts must be tested against *N.J.S.A.* 2A:15–97. As we have indicated, in that statute the legislature eliminated double recovery to plaintiffs and allocated the benefit of what had previously been double recovery to the liability insurance industry. The Commissioner was not free to alter that scheme. Accordingly, the regulations authorizing the inclusion of subrogation and reimbursement provisions in health insurance contracts must be interpreted narrowly as limited to cases in which the collateral source rule does not apply, for example, a case in which choice of law principles require application of the law of a jurisdiction with a collateral source rule at variance from our own. The health insurance benefits at issue in this case clearly do not fall into that category. Such an interpretation, that narrowly limits the application of the regulations, fairly accords with their very language that earmarks for reimbursement health care sums "received" by the insured. Where the collateral source rule applies, those amounts are subtracted from the judgment, and the insured has no entitlement to "receive" them. Oxford therefore cannot invoke the contract provision as a basis for reimbursement.

## VI

Our ruling makes it unnecessary for us to address the public policy argument advanced by Oxford that it is only fair to make

the tortfeasor's liability carrier reimburse the health insurer. However, we choose to do so. Our conclusion is informed by the nature of insurance:

> Insurance is a plan of risk management or risk sharing. For a price or premium, an insured is offered an opportunity to share the costs of a defined possible economic loss. The economic loss insured against may include a variety of subjects defined by the contract or policy, such as personal loss associated with loss of life, health or income due to death, illness, disability, unemployment or old age; property loss due to direct or indirect damage to personal or real property as a result of a variety of causes; or liability loss, resulting from negligence that caused bodily harm or property damage to others.
>
> The risk management or risk sharing commonly occurs through an insurer. However, persons may choose to self-insure, or spread or 'pool' the effects of a risk through group plans. The economic loss being shared with the insurer or group is defined by a contract or policy offered by the insurer for a price or premium. The premium includes an assessment of initial and continuing expenses, actual and contingent, creation of a 'pool' from which to pay claims, and contribution to the insurer's investment income from which the insurer pays the cost of operation and development of business. Since the risk or loss covered by the insurance is in the future, the exact risk or loss is not known when the insurance contract or policy is issued. All who are sharing the risk, both insurers and insureds, view the risk as the probable amount of loss, and the amount of coverage and the premium for the insurance actually purchased are calculated on this unknown.
>
> [Joseph DuBray, *A Response to the Anti–Subrogation Argument: What Really Emerged From Pandora's Box,* 41 *S.D. L.Rev.* 264, 272 (1996).]

That bargain, struck between an insurer and its insured guarantees payments, in exchange for a premium, regardless of whether an injury was caused by the insured or a third party. *Ibid.; see also* Roger Baron, *Subrogation: A Pandora's Box Awaiting Closure,* 41 *S.D. L.Rev.* 237, 241 43(1996)(stating that insured is not getting double recovery but is simply recovering on contract for which premiums have been paid, and insurer should not benefit from plaintiff's foresight to purchase insurance); *Youngblood v. American States Ins. Co.,* 262 *Mont.* 391, 866 *P.2d* 203, 208 (1993)(holding that subrogation provision invalid due to public policy considerations including fact that insured had paid premium for medical payment coverage).

In light of the nature of the insurance gamble, we are unwilling to accept the suggestion that placing the burden of reimbursing the health insurers' rate-payers on the liability carriers' premium-

payers is ineluctably the only fair outcome. Although the Legislature could certainly have made such a judgment, where it clearly chose a different course we see no compelling public policy argument requiring us to interpret the statute to achieve a different end. Our judgment is not on the wisdom of the legislative enactment, but only on its meaning. *Burt v. West Jersey Health Systems*, 339 *N.J.Super.* 296, 309, 771 *A.*2d 683 (App.Div.2001).

## VII

■ Health insurers have no common law equitable right to subrogation. Under the common-law collateral source rule, plaintiffs had the right to keep their health insurance proceeds and their full tort judgments. In amending the common-law collateral source rule, *N.J.S.A.* 2A:15–97 eliminated double recovery to plaintiffs, allocated the benefit of that elimination to liability carriers, and left health insurers in the same position they had been in before its enactment—with no right to recover paid benefits from the insured or from the tortfeasor. In allocating the benefit of no-double-recovery to liability carriers, *N.J.S.A.* 2A:15–97, in turn, barred the Commissioner of Insurance from enacting a different allocation scheme. Thus, the Commissioner's regulations empowering health insurers to include reimbursement and subrogation provisions in their contracts only apply to cases that do not involve the collateral source rule.

## VIII

The judgment of the Appellate Division is reversed. The judgments of the trial court are reinstated.

*For reversal and reinstatement*—Chief Justice PORITZ and Justices STEIN, COLEMAN, LONG, VERNIERO, LaVECCHIA and ZAZZALI—7.

*Opposed*—None.