745 A.2d 586 (2000)
328 N.J. Super. 265
M & B APARTMENTS, INC., Plaintiff,
v.
Milton TELTSER, Belle Teltser, Sylvia Sherman, Margaret Sharfstein, 396 Union Avenue Associates, L.P., Dan Sawicki, General Star Indemnity Co., Hartford Fire Insurance Company and Vigilant Insurance Co., Defendants, and
Federal Insurance Co., Defendant-Respondent,
v.
North American Specialty Insurance Co., Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued December 13, 1999.
Decided February 16, 2000.
*587 Paul A. Sandars, III, Roseland, for appellant (Lum, Danzis, Drasco, Positan & Kleinberg, attorneys; Mr. Sandars, of counsel and on the brief with Lisa A. Firko and Julia E. Romero).
Jeffrey M. Winn, admitted pro hac vice, for respondent (Gallo, Geffner, Fenster, attorneys; Joseph K. Powers, Anthony J. Andolino and Mr. Winn, on the brief).
Before Judges HAVEY, KEEFE and LINTNER.
The opinion of the court was delivered by HAVEY, P.J.A.D.
The central issue raised by this appeal is whether defendant Federal Insurance Company (Federal), a second-tier excess insurance carrier, owes a duty to defendant North American Specialty Insurance (NAS), a third-tier excess carrier, to negotiate and settle in good faith an insureds' first-party property loss claim in accordance with the principles enunciated in Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 323 A.2d 495 (1974). We hold that no such duty exists in the context of a first-party claim. Rather, to show a claim of bad faith, NAS must demonstrate the absence of a reasonable *588 basis for Federal's refusal to settle. NAS fails to meet that burden. Accordingly, we affirm the trial court's order dismissing NAS's cross-claim for damages against Federal.
On February 11, 1994, an apartment complex in Irvington was destroyed by fire. In May 1994, parties claiming an insurable interest in the apartment complex instituted an action to recover insurance proceeds for the loss. The property was insured by a primary insurer and four tiers of excess coverage insurers: (1) General Star Indemnity Company (General Star) issued the primary policy with a coverage limit of $250,000; (2) Fireman's Fund Insurance Company (Fireman's Fund) issued the first-tier excess policy, covering up to $250,000 for losses exceeding $250,000; (3) Federal issued the second-tier excess policy, covering up to $1.5 million for losses exceeding $500,000; and (4) NAS issued the third-tier excess policy covering up to $2.5 million for losses exceeding $2 million.[1]
The policy issued by Federal provided for payment based on the actual cash value of the subject property immediately prior to the loss. However, the insureds had purchased optional "replacement cost" coverage. Under the replacement cost endorsement, Federal pays either the replacement cost of the covered property or the cost actually expended in repairing it, whichever was less. The policy provides that the insured could recover based on the actual cash value basis and reserve its right to make a further claim based on replacement cost. The insured was required to satisfy the following condition precedent in order to recover replacement cost:
3. The Company shall not be liable under this endorsement for any loss unless and until the damaged or destroyed property is actually repaired or replaced by the insured with due diligence and dispatch.
Federal was aware that the insureds were considering purchasing, rather than rebuilding a replacement structure. During discovery, the parties exchanged replacement cost estimates ranging from $3.9 million to $5.2 million. Federal acknowledged that these estimates exceeded its $1.5 million coverage limit, and accordingly notified NAS of its potential liability as the third-tier excess insurer. Federal suggested settlement discussions with NAS.
On October 8, 1997, a court-appointed umpire and the parties' appraisers issued their findings, fixing the actual cash value of the property immediately before the fire at $800,000, and the replacement cost at $3,337,200. General Star and Fireman's Fund, the primary and first-tier excess carriers, paid their respective policy limits of $250,000. On or about October 24, 1997, Federal paid $300,000, the balance of the actual value, plus $7,325 for the cost of boarding up the property.
The insureds made a formal settlement demand of $2.3 million. Deducting the actual cash value already paid by General Star, Fireman's Fund and Federal, Federal and NAS were called upon to pay the balance. NAS agreed to the settlement, provided Federal pay its policy limit of $1.5 million as the second-tier excess insurer, with the balance to be paid by NAS. Federal rejected the settlement offer.
In an order for judgment dated January 2, 1998, the insureds were given the right "under the insurance policies issued by Federal and NAS to replace the insured property by purchasing or rebuilding" a comparable structure, without geographic limitation. They were given until January 2, 1999, to purchase or commence rebuilding.[2] Cross-claims between Federal and *589 NAS were preserved. In its cross-claim NAS alleged that Federal had acted in bad faith by refusing to settle for $2.3 million. NAS also alleged breach of contract, breach of fiduciary duty, and tortious interference with NAS's contractual rights. It sought both compensatory and punitive damages.
By summary judgment dated October 9, 1998, the trial court dismissed NAS's cross-claims, concluding that Federal had not acted in bad faith, and that NAS's remaining claims were legally deficient.
In December 1998, the insureds entered into a written contract to purchase a replacement residential apartment complex in Hallendale, Florida, for $4,750,000. In January 1999, they moved to compel Federal and NAS to pay the "replacement cost" under the policies to be applied toward the purchase price of the Florida property. The trial court ordered that the replacement cost be paid, but only in the event that closing takes place on or before February 27, 1999. The court directed that if the insureds failed to close by that date, Federal and NAS would be relieved of their duty to render payment under their policies. The parties ultimately settled, and a timely closing took place. Under the settlement, Federal paid $850,000 and NAS paid $1 million.
Citing Rova Farms, NAS argues that Federal breached its duty of good faith and fair dealing to NAS as an excess insurer. As NAS points out, it was undisputed that the subject property was destroyed by fire, the loss was a covered risk, and the insureds offered to settle for $2.3 million, approximately $1,337,200 less than the replacement cost ultimately fixed by the court-appointed appraiser. NAS claims that Federal acted in bad faith by "assert[ing] complete control over the settlement process" and "manipulating the insureds to go down to the wire to close on a replacement property," knowing that the insureds' loss exceeded Federal's $1.5 million policy limit. NAS reasons that Federal's "wrongful and unsupportable actions" caused NAS ultimately to pay $1 million toward the $1,850,000 settlement, or $700,000 more than it would have paid had the parties settled the matter for $2.3 million.
It is of course settled that an insurer reserving full control under a policy for settling a claim against its insured, becomes the insured's agent, and, in its fiduciary capacity, must act in good faith. Rova Farms, supra, 65 N.J. at 492, 323 A.2d 495. This is because the insured, by the terms of such a policy, is proscribed from settling on his own behalf. Ibid. Consequently, the insurer:
having contractually restricted the independent negotiating power of its insured, has a positive fiduciary duty to take the initiative and attempt to negotiate a settlement within the policy coverage. Any doubt as to the existence of an opportunity to settle within the face amount of the coverage or as to the ability and willingness of the insured to pay any excess required for settlement must be resolved in favor of the insured unless the insurer, by some affirmative evidence, demonstrates there was not only no realistic possibility of settlement within policy limits, but also that the insured would not have contributed to whatever settlement figure above that sum might have been available.

[Id. at 496, 323 A.2d 495.]
In Estate of Louis Penn v. Amalgamated Gen. Agencies, 148 N.J.Super. 419, 423, 372 A.2d 1124 (App.Div.1977), we held that the principles enunciated in Rova Farms also apply between primary and excess insurer on the basis of the general rule that an excess insurer is subrogated to the insured's rights against the primary insurer. We quoted Peter v. Travelers Ins. Co., 375 F.Supp. 1347, 1350-51 (D.C.Cal.1974), which held:
Under the doctrine of equitable subrogation, the duty owed an excess insurer is identical to that owed to the insured. The excess will not be able to force the primary into accepting any settlement *590 which his duty to the insured would not require accepting. St. Paul-Mercury Indemnity Co. v. Martin, supra, [190 F.2d 455] at 457 [10th Cir.1951]. In considering whether it will settle a claim, the primary insurer may consider its own interests, but it must equally consider the interests of the insured, which become the interests of the excess insurer by subrogation.
While the interests of the primary insurer are, for the most part, unaffected by the existence of excess coverage, the interests of the excess carrier are very much affected by the actions of the primary. If the primary carrier undertakes the representation of the insured, then it has the sole right to negotiate settlements. If the primary carrier is relieved of its duty to accept reasonable offers by the existence of excess insurance, it would put an additional financial liability on the excess carrier which would be reflected in increased premiums. It would also have the effect of reducing the incentive of a primary insurer to settle when the settlement offer is near or over its policy limits. This is contrary to the interests of the public and the insured in obtaining prompt and just settlement of claims.
[Estate of Louis Penn, supra, 148 N.J.Super. at 423-24, 372 A.2d 1124.]
See also, General Accident Ins. Co. v. New York Marine & Gen. Ins. Co., 320 N.J.Super. 546, 555, 727 A.2d 1050 (App.Div.1999) (the duty owed an excess insurer from the primary insurer is identical to that owed the insured); Baen v. Farmers Mut. Fire Ins. Co., 318 N.J.Super. 260, 267, 723 A.2d 636 (App.Div.1999) (same).
However, NAS has cited no New Jersey authority for the proposition that the Rova Farms good-faith duty applies in the context of first-party property claims. By the very terms of first-party coverage, an insurer contracts to pay an insured the actual loss suffered as a result of a covered peril; it does not insure against exposure to third-party claims. Thus, neither an insured nor its excess insurer is exposed to the uncertainties of third-party claim valuations or to the potential for a primary insurer's self-interested refusal to settle such claims.
Consequently, there is a recognized distinction between the good-faith duty imposed by Rova Farms and the duty owed in the context of first-party claims. In Pickett v. Lloyd's, 131 N.J. 457, 467, 621 A.2d 445 (1993), our Supreme Court held that an insurer owes a duty of good faith to its insured in processing a first-party claim. While the duty of good faith and fair dealing is implied in every contract, Onderdonk v. Presbyterian Homes, 85 N.J. 171, 182, 425 A.2d 1057 (1981), in the insurance field, "principles of equity, fair dealing and good faith ... breathed new lifegiving honesty into the bare contractual relationship sometimes mentioned as existing between insured and insurer." Rova Farms, supra, 65 N.J. at 491, 323 A.2d 495. The Court in Pickett pointed to N.J.S.A. 17:29B-1 to -14, which includes in its definition of unfair insurance, "[n]ot attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear...." N.J.S.A. 17:29B-4(9)(f).
Pickett recognized a cause of action for bad-faith refusal to pay an insured's claim, and adopted the "fairly debatable" standard articulated by the Wisconsin Supreme Court in Anderson v. Continental Ins. Co., 85 Wis.2d 675, 271 N.W.2d 368, 376-77 (1978), and analyzed by the Rhode Island Supreme Court in Bibeault v. Hanover Ins. Co., 417 A.2d 313, 319 (R.I.1980). The Bibeault court stated the standard: "If a claim is `fairly debatable,' no liability in tort will arise." Ibid. In adopting this standard, the Bibeault court quoted Anderson v. Continental at length:
"To show a claim for bad faith, a plaintiff must show the absence of a reasonable basis for denying benefits of the policy and the defendant's knowledge or reckless disregard of the lack of a reasonable *591 basis for denying the claim. It is apparent, then, that the tort of bad faith is an intentional one ....implicit in that test is our conclusion that the knowledge of the lack of a reasonable basis may be inferred and imputed to an insurance company where there is a reckless ... indifference to facts or to proofs submitted by the insured."
[Ibid. (quoting Anderson v. Continental Ins. Co., 85 Wis.2d 675, 271 N.W.2d 368, 376-77 (1978)).]
If the duty owed by a primary insurer to an excess insurer is identical to that owed to an insured, it follows that the rights of an excess insurer can rise no greater than those enjoyed by the assured. See Standard Accident Ins. Co. v. Pellecchia, 15 N.J. 162, 172, 104 A.2d 288 (1954) ("The subrogee in effect steps into the shoes of the insured and can recover only if the insured likewise could have recovered"); Hartford Accident & Indem. Co. v. Aetna Cas. & Surety Co., 164 Ariz. 286, 792 P.2d 749, 754 (1990) (under equitable subrogation, a subrogee's rights are no greater than the insured's). Consequently, NAS's argument that it has a direct or equitable subrogation claim against Federal is necessarily circumscribed by the "fairly debatable" standard adopted in Pickett in the context of the good-faith duty owed by a insurer to a first-party insured.
Applying Pickett, we agree with the trial court that NAS has not demonstrated that Federal acted in bad faith. There is no showing here of "the absence of a reasonable basis for denying benefits" to the insureds, or of Federal's "reckless disregard of the lack of a reasonable basis for denying the claim." Pickett, supra, 131 N.J. at 473, 621 A.2d 445 (quoting Anderson, supra, 271 N.W.2d at 376-77). Stated differently, NAS failed to show that no debatable reasons existed for Federal to reject the $2.3 million settlement offer. The contrary is true.
Under the "replacement cost" coverage endorsement of Federal's policy, Federal was not liable for any loss "unless and until the damaged or destroyed property was actually repaired or replaced by the insured with due diligence and dispatch." (Emphasis added). Thus, Federal had absolutely no duty to tender replacement cost or even settle the insureds' claim until the destroyed property was "actually repaired or replaced." In June 1997, when the insureds made their settlement demand, they still had not repaired or replaced the premises, and indeed had no firm proposal on the table to do so. The settlement contemplated payment of $1.5 million by Federal, but there was no obligation on its part to pay the maximum coverage under the policy when the insureds had not satisfied the condition precedent.
Moreover, when the final judgment was entered on January 2, 1998, fixing the replacement value at $3,337,200, the court ordered the insureds to exercise their right to replace or commence rebuilding the property within one year. The record is clear that the structure destroyed by the fire was a nonconforming use and therefore the insureds could not rebuild on the subject lot. During 1998, the insureds negotiated two deals for a replacement property, neither of which materialized. Even on October 9, 1998, when the trial court dismissed NAS's cross-claim against Federal, the insureds had not consummated a deal to replace the property.
It was not until December 1998, two months before expiration of the extended deadline to replace the structure, that the insureds entered into a written agreement to purchase the Florida replacement apartment complex. At this point, when the insureds moved to compel payment under the Federal and NAS policies in December 1998, Federal and even NAS itself resisted payment because they took the position that execution of a contract of sale alone did not constitute "replacement" under the *592 terms of either policy.[3] In opposition to the insureds' motion, NAS argued that: "It is clear from the undisputed facts in this case that [the insureds] have not replaced the subject property to date. Therefore, NAS has no obligation whatsoever to pay any benefits to [the insureds] under the subject policy." In short, Federal was entirely within its rights, consistent with the terms of its policy, to reject the settlement offer and hold the insureds to their obligation under the policy and the January 2, 1998 judgment to actually replace the structure before tendering payment.
We have considered NAS's additional argument that the trial court erred in dismissing its breach of contract, tortious interference, and punitive damage claims and are satisfied they are without merit and do not warrant extensive discussion by formal opinion. R. 2:11-3(e)(1)(E).
Affirmed.
NOTES
[1] Hartford Fire Insurance Company issued a fourth-tier policy, but was voluntarily dismissed from the case.
[2] By consent order, the January 2, 1999 deadline was extended to February 22, 1999.
[3] NAS also had a provision in its policy providing that no payment will be made "until the lost or damaged property is actually repaired or replaced."