988 A.2d 1230 (2010)
412 N.J. Super. 126
COUNTY OF BERGEN EMPLOYEE BENEFIT PLAN and the county of Bergen, Plaintiffs-Respondents,
v.
HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY, ACS Recovery Services, Inc., Primax Recoveries, Inc., Defendants-Appellants, and
Insurance Design Administrators, Defendant.
Docket No. A-0616-09T1
Superior Court of New Jersey, Appellate Division.
Argued January 20, 2010.
Decided February 24, 2010.
*1232 Edward S. Wardell, Haddonfield, argued the cause for appellant Horizon Blue Cross Blue Shield of New Jersey (Wardell, Craig, Annin and Baxter, LLP, attorneys; Mr. Wardell and Ekta Patel, on the brief).
Lorin M. Subar (Sumner, Schick and Pace) of the Texas bar, admitted pro hac vice, argued the cause for appellants ACS Recovery Services, Inc., and Primax Recovery Services, Inc. (McCarter & English, LLP, attorneys; David J. Cooner, of counsel; Mr. Subar and Natalie S. Watson, Newark, on the brief).
Leonardo M. Tamburello argued the cause for respondents County of Bergen Employee Benefit Plan and the County of Bergen (Kalison, McBride, Jackson & Hetzel, PC, attorneys; Mr. Tamburello, of counsel; Mr. Tamburello and Rebecca M. Szelc, on the brief).
Before Judges CARCHMAN, PARRILLO and LIHOTZ.
The opinion of the court was delivered by
PARRILLO, J.A.D.
We granted leave to appeal to determine whether plaintiffs' claims against defendants, for failure to pursue subrogation actions to recover medical expenses plaintiffs paid to certain insureds who brought personal injury claims against third-party tortfeasors, are barred by the Collateral Source Rule, N.J.S.A. 2A:15-97 (Section 97). For reasons that follow, we conclude that the trial court erred in denying defendants' Rule 4:6-2(e) motion to dismiss plaintiffs' complaint and therefore reverse.
Plaintiff Bergen County (County) is a public entity of the State which, pursuant to N.J.S.A. 40A:10-6(e), established plaintiff County of Bergen Employee Benefit Plan (Plan), a self-insured benefits plan for its employees' and their dependents' healthcare. Effective July 1, 2006, defendant Horizon Blue Cross Blue Shield of New Jersey (Horizon) and the County entered into an Administrative Services Agreement (ASA) pursuant to which Horizon became the Plan's Administrator.[1] In this role, Horizon provided claims processing, adjudication, and other services related to the Plan. Although Horizon was the Plan's Administrator, it subcontracted subrogation issues to defendants Affiliated Computer Services, Inc. (ACS) and Primax Recoveries, Inc. (Primax) (jointly ACS/Primax). The Plan's insuring agreement contains a provision permitting it to recover amounts paid to its insureds as a result of third-party negligence:
If you or your dependent incur medical expenses as a result of the actions of a Third Party (anyone other than you) or the Plan and that Plan has made payment for those expenses, the Plan has the right to recoup those payments.
This means that if your medical expenses are reimbursed by a Third Party, satisfied judgment or other means, you are required to return any health benefits paid for illness, Accidental Injury, Biologically-based Mental Illness and Non-Biologically Based Medical Illness or substance abuse to the Plan
. . . .

*1233 This repayment agreement will be binding whether the payment received from the Third Party is the result of a legal judgment, arbitration award, a compromise settlement, or any other arrangement, or whether the Third party has admitted liability for the payment.
The instant lawsuit arose out of plaintiffs' efforts to seek reimbursement for medical expenses they paid under the Plan on behalf of an employee, Andres Tineos. In August of 2002, his wife, Wanda, became pregnant and advised her physician that she was predisposed to bear a child inflicted with myotubular myopathy (MTM), "a congenital muscular disease which causes severe physical disability." Wanda underwent an amniocentesis procedure to detect MTM and other abnormalities. Justin was born on April 7, 2003, with MTM.
In 2004, the Tineos filed a medical malpractice lawsuit, alleging that due to the negligence of physicians, laboratory workers, and possibly others, the test samples were either not tested or reported to be false-negative for MTM. In February 2007, a jury returned a verdict for $28,000,000, and the case was settled, post-judgment, for $18,000,000.
The Plan paid approximately $575,701.91 in net benefits associated with Justin Tineos' care. In December 2003, the Tineos' inquired of Horizon and IDA as to any lien they intended to pursue on plaintiffs' behalf, on the Tineos' recovery. Horizon forwarded counsel's request to its subrogation consultant, ACS/Primax. In February and May 2006, ACS/Primax advised the Tineos' counsel that it would not seek subrogation against any recovery from the medical malpractice litigation.
Plaintiffs claim not to have had any direct knowledge of the Tineos' lawsuit at the time it was filed. Nor were they aware of any of the correspondence between the Tineos' attorney and either Horizon or ACS/Primax. According to plaintiffs, Horizon failed to inform them that it did not intend to seek subrogation or reimbursement on their behalf. In October 2007, when plaintiffs first learned about the Tineos' settlement and defendants' decision not to seek subrogation, plaintiffs filed an action against defendants, alleging breach of contract, breach of fiduciary duty, and negligence in failing to pursue plaintiffs' claimed right of subrogation to recover from third-party tortfeasors funds which the Plan paid for Justin Tineo's healthcare and which, they allege, are recoverable by participants under the Plan.
On August 5 and 6, 2009, Horizon and ACS/Primax, respectively, filed motions to dismiss, pursuant to Rule 4:6-2(e), maintaining that Section 97 bars Plan participants, and therefore defendants, from seeking reimbursement of medical expenses paid to the Plan participant through the Plan. Plaintiffs cross-moved for declaratory judgment that the reimbursement limitations of Section 97 do not apply to self-insured municipalities. Following argument, the trial court denied both motions, unable, on the one hand to "conclude that [Section 97] and Perreira [v. Rediger, 169 N.J. 399, 778 A.2d 429 (2001)] foreclose Plaintiff's ability to recover the damages alleged[,]" yet, on the other hand, unable to "enter a declaratory judgment holding that neither [Section 97] nor Perreira bar these claims[,] as insufficient evidence has [been] presented to suggest that public entities are exempted from [Section 97] and Perreira." We granted defendants' motion for leave to appeal, and now reverse.
Here, the essential issue is whether the Collateral Source Rule bars plaintiffs, who expended funds on behalf of their insured, to recoup those payments through subrogation or contract reimbursement when the insured recovers against a tortfeasor in *1234 a post-verdict settlement. Statutory interpretation is a question of law for the court, subject to independent review. In re Liquidation of Integrity Ins. Co., 193 N.J. 86, 94, 935 A.2d 1184 (2007); Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378, 658 A.2d 1230 (1995); New Jersey Mfrs. Ins. Co. v. Horizon Blue Cross Blue Shield of New Jersey, 403 N.J.Super. 518, 523-24, 959 A.2d 858 (App. Div.2008). As such, the reviewing tribunal owes no deference to a trial court's interpretation of the statutory language, or to its assessment of "the legal consequences that flow from established facts." Manalapan Realty, L.P., supra, 140 N.J. at 378, 658 A.2d 1230.
Ultimately, "our goal is to interpret the statute consistent with the intent of the Legislature." Oberhand v. Dir., Div. of Taxation, 193 N.J. 558, 568, 940 A.2d 1202 (2008). Under well-settled rules of statutory construction, we give a statute's "words and phrases" their usual and ordinary meaning, N.J.S.A. 1:1-1, because the words of a statute ordinarily provide the most reliable indication of legislative intent. We also construe the language of the statute in light of the entire statute and the overall statutory scheme. Burnett v. County of Bergen, 198 N.J. 408, 421, 968 A.2d 1151 (2009) (quoting Bedford v. Riello, 195 N.J. 210, 224, 948 A.2d 1272 (2008)). We also interpret the statutory language in context, examining other legislation on the same subject to determine the Legislature's probable intent. See American Fire and Cas. Co. v. New Jersey Div. of Taxation, 189 N.J. 65, 81, 912 A.2d 126 (2006); Lloyd v. Vermeulen, 22 N.J. 200, 204, 125 A.2d 393 (1956). When the language in a statute "is clear and unambiguous, and susceptible to only one interpretation," we presume the Legislature meant what it said and that the plain meaning governs. Burnett, supra, 198 N.J. at 421, 968 A.2d 1151 (quoting Lozano v. Frank DeLuca Constr., 178 N.J. 513, 522, 842 A.2d 156 (2004)). However, "if there is ambiguity in the statutory language that leads to more than one plausible interpretation, we may turn to extrinsic evidence, `including legislative history, committee reports, and contemporaneous construction.'" DiProspero v. Penn, 183 N.J. 477, 492-93, 874 A.2d 1039 (2005) (quoting Cherry Hill Manor Assocs. v. Faugno, 182 N.J. 64, 75, 861 A.2d 123 (2004) (internal citations omitted)). Courts "may also resort to extrinsic evidence if a plain reading of the statute leads to an absurd result." Id. at 493, 874 A.2d 1039.
Governed by these principles, we now turn to the statute in question. Prior to 1987, New Jersey followed the common-law collateral source rule, which prohibited a tortfeasor from reducing payment of a tort judgment by the amount of money received by an injured party from other sources. In effect, the common-law collateral source rule "allow[ed] an injured party to recover the value of medical treatment from a culpable party, irrespective of payment of actual medical expenses by the injured party's insurance carrier." Perreira, supra, 169 N.J. at 406, 778 A.2d 429 (internal citation omitted).
In 1987, New Jersey abrogated the common-law rule by enacting N.J.S.A. 2A:15-97, which provides:
In any civil action brought for personal injury or death, ... if a plaintiff receives or is entitled to receive benefits for the injuries allegedly incurred from any other source other than a joint tortfeasor, the benefits, other than workers' compensation benefits or the proceeds from a life insurance policy, shall be disclosed to the court and the amount thereof which duplicates any benefit contained in the award shall be deducted from any award recovered by the plaintiff, less any premium paid to an insurer directly by the plaintiff or by any member of the *1235 plaintiff's family on behalf of the plaintiff for the policy period during which the benefits are payable. Any party to the action shall be permitted to introduce evidence regarding any of the matters described in this act.
[ (Emphasis added).]
Section 97's purpose is twofold: "to eliminate the double recovery to plaintiffs that flowed from the common-law collateral source rule and to allocate the benefit of that change to liability carriers." Perreira, supra, 169 N.J. at 403, 778 A.2d 429. The latter goal was clearly the containment of spiraling liability insurance costs. Id. at 410, 778 A.2d 429. By reducing a plaintiff's tort judgment by the amount of benefits already received (with limited statutory exceptions not here relevant), the Legislature intended to reduce the burden to liability carriers, rather than health insurers. Id. at 410-11, 778 A.2d 429. "As the legislative history reveals, the choice was made to favor liability carriers." Id. at 411, 778 A.2d 429. See also Kiss v. Jacob, 138 N.J. 278, 282, 650 A.2d 336 (1994) (stating that intent of the Legislature was to control spiraling automobile-insurance costs); Lusby v. Hitchner, 273 N.J.Super. 578, 591, 642 A.2d 1055 (App. Div.1994) (stating that legislative determination "was apparently not only to prevent plaintiffs from obtaining a double recovery but also, except where [personal injury protection] payments are involved, to shift the burden, at least to some extent, from the liability and casualty insurance industry to health and disability third-party payers."). Thus, in enacting Section 97, "the Legislature eliminated double recovery to plaintiffs, reduced the burden on the tortfeasors' liability carrier and left health insurers in the same position as they were prior to the enactment of N.J.S.A. 2A:15-97." Perreira, supra, 169 N.J. at 411, 778 A.2d 429.
In Perreira, supra, the Court held that Section 97 barred the plaintiffs' health care carrier, Oxford Health Plans, from recovering medical expenses by reimbursement or subrogation. Id. at 414-16, 778 A.2d 429. Like the Plan in this case, the Oxford policies contained a reimbursement provision which stated that Oxford could recover expended health care costs from a settlement or judgment against the tortfeasor. Id. at 414, 778 A.2d 429. That policy provision was pursuant to the Insurance Commissioner's authorization, via regulation, of subrogation and reimbursement provisions in health insurance contracts. Id. at 416, 778 A.2d 429. Despite the presence of this provision in the insurance contract, the Court nevertheless concluded that Section 97 eliminated double recoveries by the beneficiary and required a court to deduct from any tort judgment any amount received by a plaintiff from a collateral source, other than workers compensation and life insurance. Id. at 409, 778 A.2d 429. Because the plan beneficiaries could not recover the medical expenses from the tortfeasor, the health care carrier had no right to subrogation or contract reimbursement. Id. at 418, 778 A.2d 429. Moreover, "[i]n allocating the benefit of no-double-recovery to liability carriers, N.J.S.A. 2A:15-97, in turn, barred the Commissioner of Insurance from enacting a different allocation scheme." Ibid.
With the nullification of the contractual undertaking, which would have allowed direct recovery against its insured, plaintiffs instead rely on the traditional notion of subrogation, which "substitutes a health insurer in place of the plaintiff insured to whose rights he or she succeeds in relation to the debt and gives to the substitute all the rights, priorities, remedies, liens, and securities of the person for whom he or she is substituted[.]" Id. at 408 n. 1, 778 A.2d 429 (internal citations *1236 omitted). Thus, plaintiffs, as subrogees, are subrogated to the rights of the Tineos, as subrogors, to recover sums the Plan paid for healthcare on their behalf. However, a subrogee has no better rights than its subrogor. M & B Apartments, Inc. v. Teltser, 328 N.J.Super. 265, 273, 745 A.2d 586 (App.Div.), certif. denied, 165 N.J. 133, 754 A.2d 1210 (2000); Hanover Ins. Co. v. Borough of Atl. Highlands, 310 N.J.Super. 599, 603, 709 A.2d 328 (Law Div.1997), aff'd, 310 N.J.Super. 568, 709 A.2d 236 (App.Div.), certif. denied, 156 N.J. 383, 718 A.2d 1212 (1998); Mayfair Fabrics v. Henley, 101 N.J.Super. 363, 368, 244 A.2d 344 (Law Div.1968). Because the damages that the injured insured may recover in a personal injury action do not include amounts paid by collateral sources, the third-party health insurers that paid those benefits have no right of recovery or subrogation from their insureds' personal injury awards or settlements. Cf. Standard Accident Ins. Co. v. Pellecchia, 15 N.J. 162, 172, 104 A.2d 288 (1954).
Section 97's broad language is only curtailed by its own statutory exceptions (workers' compensation benefits and life insurance proceeds), which are not applicable here, or when necessitated by an actual conflict with other statutory schemes that either preempt its operation by law or evince a countervailing legislative policy. For example, in Lusby, supra, we determined that "benefits" under Section 97 do not include reimbursable benefits paid by Medicaid, in large part due to the conflict between Section 97 and the Medicaid lien and reimbursement statute, N.J.S.A. 30:4D-7.1 (Section 7.1).[2] 273 N.J.Super. at 590-92, 642 A.2d 1055. We held that because a "state's Medicaid lien and reimbursement provisions are required by federal law, principles of supremacy and preemption would ... apply." Id. at 592, 642 A.2d 1055. A state statute "could not, even if that were its intent, defeat the federal reimbursement scheme by the simple expedient of making medical expenses already paid by Medicaid deductible from a tort recovery against the tortfeasor." Ibid. For this reason, Section 97 yielded to Section 7.1.
In Lusby, we also noted that neither of Section 97's twin purposespreventing double recovery and reducing the cost of liability coverageare realized by including Medicaid as a "benefit" under its provisions. Id. at 591, 642 A.2d 1055. Applying the analogous holding of Marmorino v. Housing Authority of Newark, 189 N.J.Super. 538, 461 A.2d 171 (Law Div. 1983)[3], we noted that "a plaintiff could not... pocket a double recovery for medical expenses for the reason that his entire recovery is subject to Medicaid's reimbursement *1237 rights[,]" pursuant to Section 7.1. Lusby, supra, 273 N.J.Super. at 591, 642 A.2d 1055.
Likewise, in Kiss, supra, the Court found that "`benefits[,]' as used in [Section 97] [does not] include the proceeds of a plaintiff's settlement with a defendant later found to bear no liability." 138 N.J. at 281-82, 650 A.2d 336. This is because of the "awkward" relationship between Section 97 and N.J.S.A. 2A:15-5.2 (Section 5.2), New Jersey's comparative negligence law, under which "the trier of fact would determine not only the full value of the personal-injury plaintiff's damages but also the extent, in the form of a percentage, of each party's causative negligence." Kiss, supra, 138 N.J. at 283-84, 650 A.2d 336. If "benefits" includes a settlement from a defendant later found to be not at fault, a defendant later found to be one-hundred percent liable for the plaintiff's injuries could theoretically pay nothing in damages. This would violate the basic tenet of Section 5.2, that "`[e]ach tortfeasor is liable for the same percentage of negligence found attributable to him.'" Id. at 284, 650 A.2d 336 (quoting Rogers v. Spady, 147 N.J.Super. 274, 277, 371 A.2d 285 (App.Div.1977)). Therefore, the Kiss Court allowed a limited exception to Section 97, rather than contravene Section 5.2. Id. at 283-84, 650 A.2d 336.
Here, of course, there is neither a statutory exception nor conflict necessitating an exception to the Collateral Source Rule. Undoubtedly, plaintiffs' payment to the Tineos in the amount of $575,701.91 for Justin's healthcare constitutes "benefits" under Section 97 and is neither exempted workers' compensation benefits nor the proceeds from a life insurance policy.[4] That amount is, therefore, not recoverable through subrogation or reimbursement.
Nor is there any conflict between Section 97 and any other statutory provision which would compel exclusion from the Collateral Source Rule's proscription. Indeed, plaintiffs acknowledge as much, but essentially argue that there is an implicit exemption for a self-insured municipality.[5] Contrary to plaintiffs' argument, nothing in Perreira, supra, suggests the rule applies only to non-taxpayer-funded health insurers. Simply put, there is no statutory exception for a self-insured municipality. To the contrary, Section 97 draws no distinction between a publicly-funded payment source and a private, for-profit health insurer.
*1238 Plaintiffs' contrary argument relies heavily on policy. In this regard, plaintiffs contend that "public entities have received historically preferential treatment when it comes to `shifting of losses' upon, and being shielded from paying, commercial insurers." In support, plaintiffs claim that the Legislature intended to favor public entities over commercial insurers, especially since the cost of providing health coverage is becoming increasingly expensive. Plaintiffs argue that if Section 97 is interpreted literally, then plaintiffs "and the public employees and taxpayers who stand behind them would be relegated to the ranks of those beneath the status of liability insurers...."
There is no evidence to suggest that the Legislature intended to favor public entities under Section 97 or that it was not intended to apply to amounts received by a tort plaintiff from public sources. The plain language of Section 97 states that it applies to "benefits" received by a tort plaintiff from "any" source, and, unlike workers' compensation benefits and the proceeds from a life insurance policy, amounts received from public sources, such as a self-funded County health plan, are not excepted from Section 97.
As noted, it is well established that "`the best indicator of [Legislative] intent is the statutory language.'" Burnett, supra, 198 N.J. at 421, 968 A.2d 1151 (quoting DiProspero, supra, 183 N.J. at 492, 874 A.2d 1039). When a statute is plain on its face, we do not "interpret [it] to achieve a different end." Perreira, supra, 169 N.J. at 418, 778 A.2d 429. "Our judgment is not on the wisdom of the legislative enactment, but only on its meaning." Ibid. The Legislature, not the courts, is best suited to address such policy arguments. See Lewis v. Harris, 188 N.J. 415, 460, 908 A.2d 196 (2006).
In reviewing defendants' motion to dismiss pursuant to Rule 4:6-2(e), "`our inquiry is limited to examining the legal sufficiency of the facts alleged on the face of the complaint.'" Banner v. Hoffmann-La Roche Inc., 383 N.J.Super. 364, 374, 891 A.2d 1229 (App.Div.2006) (quoting Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 746 (1989)), certif. denied, 190 N.J. 393, 921 A.2d 447 (2007). We must search the complaint "in depth and with liberality to ascertain whether the fundament of a cause of action may be gleaned even from an obscure statement of claim, opportunity being given to amend if necessary." Banco Popular N. Am. v. Gandi, 184 N.J. 161, 165, 876 A.2d 253 (2005) (quoting Printing Mart-Morristown, supra, 116 N.J. at 746, 563 A.2d 31) (internal quotations and citations omitted)). However, "if the complaint states no basis for relief and discovery would not provide one, dismissal is the appropriate remedy." Id. at 166, 876 A.2d 253 (quoting Pressler, Current N.J. Court Rules, comment 4.1 on R. 4:6-2 (2005) (internal citation omitted)).
Measured against this standard, the trial court erred in denying defendants' motion to dismiss plaintiffs' complaint. The only basis for plaintiffs' claims of breach of contract, breach of fiduciary duty, and negligence is that defendants failed to pursue subrogation against the Tineos to recoup plaintiffs' payments for Justin's medical expenses. Since Section 97 bars subrogation or reimbursement by plaintiffs, there is no recovery source from whom to seek reimbursement, hence no duty is owed plaintiffs by defendants, and plaintiffs suffered no resultant harm.
Reversed.
NOTES
[1] Prior to Horizon, defendant Insurance Design Administrators (IDA) acted as the Plan administrator from July 1, 1995 to June 30, 2006. Although a defendant in this action, IDA did not move for dismissal of plaintiffs' complaint and did not file a brief in this appeal. References in this opinion to defendants do not include IDA unless otherwise noted.
[2] Section 7.1(b) provides:

When a recipient ... brings an action for damages against a third party, written notice shall be given to the Director of the Division of Medical Assistance and Health Services. In addition, every recipient... shall promptly notify the division of any recovery from a third party and shall immediately reimburse the division in full from the proceeds of any settlement, judgment, or other recovery in any action or claim initiated against any such third party....
[ (Emphasis added).]
[3] In Marmorino, supra, the Law Division held that the collateral source rule of the Tort Claims Act (TCA) did not apply to Medicaid payments. 189 N.J.Super. at 541-42, 461 A.2d 171. In language very similar to Section 97, the TCA requires a deduction from a plaintiff's recovery of duplicative benefits received "from a policy or policies of insurance or any other source other than a joint tortfeasor...." N.J.S.A. 59:9-2(e). The court held that the TCA did not apply to Medicaid payments because (1) plaintiff would not receive double recovery due to the Medicaid reimbursement rule; and (2) the Legislature did not intend to benefit commercial insurance companies at the expense of publicly-funded Medicaid. Marmorino, supra, 189 N.J.Super. at 542, 461 A.2d 171.
[4] The Legislature intended that "benefits" under Section 97 were to include "insurance-type benefits[,]" such as life-or health-insurance policies, social security, welfare payments, and pension benefits. Kiss, supra, 138 N.J. at 282, 650 A.2d 336 (1994) (citing Statement to Senate Bill No. 2708 (Nov. 23, 1987)).
[5] Plaintiffs basically argue that application of Section 97 as enacted has unfair, unintended consequences. They point to the fact that non-governmental self-insured health plans, governed by the federal Employees Retirement Income Security Act of 1974 (ERISA), 29 U.S.C.A. § 1001-1461, may pursue subrogation because ERISA preempts Section 97. See Levine v. United Healthcare Corp., 402 F.3d 156, 166 (3d Cir.), cert. denied, 546 U.S. 1054, 126 S.Ct. 747, 163 L.Ed.2d 611 (2005). We disagree. Although ERISA preempts a state law that "relates to" an employee welfare plan, Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 96-97, 103 S.Ct. 2890, 2900, 77 L.Ed.2d 490, 501 (1983), state laws that regulate insurance companies are "saved" from preemption. O'Brien v. Two West Hanover Co., 350 N.J.Super. 441, 449, 795 A.2d 907 (App.Div.2002) (citing 29 U.S.C.A. § 1144(b)(2)(A)). Thus, N.J.A.C. 11:4-42.10 prohibits health care insurers from including subrogation and reimbursement provisions in insurance contracts. See 34 N.J.R. 647(a); 34 N.J.R. 2798(a). As a result, neither plaintiffs nor a non-governmental health insurer would be able to seek subrogation or reimbursement in this case.